UNITED STATES of America, Appellee,

v.

**Samuel Kenneth WILLIS, also known as Sharif Willis, Appellant.**

UNITED STATES of America, Appellee,

v.

**Vincent Edward FIELDS, Appellant.**

**Nos. 95–2261, 95–2654.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1995.

Decided July 22, 1996.

**1374**

Charles W. Faulkner, Minneapolis, MN, for appellant.

James Lackner, Minneapolis, MN, Douglas R. Peterson, David L. Lillehaug, U.S. Atty., Minneapolis, MN, for appellee.

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

BEAM, Circuit Judge.

The defendants, Samuel "Sharif" Willis and Vincent "King" Fields, appeal from the judgment of conviction entered by the district court [1] after a jury found the defendants guilty of several counts of drug and gun-related crimes. We affirm.

## I. BACKGROUND

This case involves a senseless display of terrorist tactics, in which customers of a service station, including small children, were held hostage at gunpoint because Willis mistakenly believed someone had taken two of his "spinners" (decorative 24–caret gold items) that were to be attached to the wheel hubs of his Mercedes–Benz. The escapade began on October 21, 1994, when Willis called Douglas "Killer" Jackson—the self-professed peace-loving "ambassador" (i.e., chief enforcement officer) emeritus to one of Chicago's largest street gangs—because Willis needed a ride to the S & S Service Station (S & S or S & S station). Several days earlier, Willis had taken his car to the station for servicing. Willis asked Jackson to pick him up at Lynn Jones's residence, where Willis had been staying. Willis loaded four wheel rims and two of the four spinners into Jackson's Cadillac, inadvertently leaving two of the spinners on Lynn Jones's gas dryer. Jackson drove Willis to the S & S station, where they loaded the rims and spinners into Willis's car. Because the car was not yet

ready, Willis and Jackson left S & S and went to a restaurant for food, a liquor store for alcohol, and a crack house for crack cocaine. Willis purchased the crack cocaine and smoked it with Jackson.

After satisfying their appetites, Willis and Jackson returned to the S & S station. Upon seeing only two spinners, Willis became angry, believing that someone had taken the other two spinners. At some point, Willis apparently also became angry with Jackson. Rather than obtaining a ride from Jackson, Willis paged Fields and eventually asked Fields to pick him up. Fields was planning to go to a movie with Danielle Riester that evening. Nevertheless, Fields drove with Riester in Field's two-door Thunderbird to pick up Willis at the City Foods parking lot across the street from S & S. When Fields and Riester arrived, Willis was enraged and complained that someone had stolen two of his spinners.

Fields, Willis, and Riester briefly stopped at the S & S station where both Jackson and Alonzo Bell, an S & S customer, exchanged words with Willis and Fields. Fields, Willis, and Riester next drove to a north Minneapolis location where they picked up two juveniles. These five people then drove in the Thunderbird to the alley behind the residence of Portia Rodgers, Field's girlfriend, where the passengers got out of the car. Willis and the two juveniles left the alley for a short time to make a telephone call, while Fields drove the Thunderbird down the alley. Riester waited alone in the alley. Fields then returned in a four-door Taurus station wagon (Taurus), which he had purchased in June of 1994 from Robin Auto Sales. Upon returning with the Taurus, Willis, Riester, and the two juveniles got back into the car. Riester sat in the front passenger seat, while Willis and the two juveniles sat in the back seat.

After stopping for gas, the group proceeded toward the S & S station. Fields parked the Taurus in a dark area alongside a warehouse about half a block from S & S. Riester stayed in the Taurus while Willis, Fields, and the two juveniles moved toward the S &

1. The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

S station. Before reaching S & S, Willis encountered Jackson and Lynn Jones, who came to the S & S station after receiving a call from Willis threatening to put the people at S & S "under arrest." Willis ordered Lynn Jones to go home and commanded Jackson to go inside S & S. Jones testified that Willis appeared to be "tripping" on drugs when he ordered her to go home.

Armed with a nine-millimeter pistol and accompanied by Fields and at least one of the two juveniles, Willis entered the S & S station and commanded the patrons, including two children, to drop to the floor. Fields and one of the two juveniles were also armed with handguns. Jimmy Mack Neal, a mechanic, and Bell slipped into the back room where they heard Willis threaten to kill everyone. Bell placed an emergency (911) call. Neal and Bell then went farther back into the storage room but inadvertently knocked over a bucket, which made a noise that revealed their hiding place. Hearing the noise, Fields went to the back room and ordered the two men to come out, threatening to shoot them if they refused. Fields took Bell and Neal at gunpoint to the front of the S & S where Willis ordered them to lie down. Willis threatened to kill Bell and also put his gun against Neal's neck while the hostages were on the floor. At various times, while holding these people hostage, Willis screamed "don't nobody take nothing from me" and "I'm not going to leave any witnesses."

At some point, Donna Jones, Neal's girlfriend, unknowingly walked into the hostage crisis, where Willis promptly hit her on the head with his gun. The violence continued when Jackson was whacked on the head with lid of a pressure cooker. Jackson fell to the floor bleeding from his head. Fields and one of the juveniles went to the Taurus where Riester was still waiting. Fields then drove the Taurus across the street and dropped off one juvenile. Fields and Riester returned to the S & S station. The other juvenile, W.W., escorted Jackson, stunned and bleeding, into the back seat of the Taurus. The irate Willis remained inside the station, brandishing his firearm and threatening the hostages.

One of the first police officers to arrive at the scene blocked the Taurus from leaving the area. The officer saw W.W. lean forward as if he was placing something under the passenger seat of the Taurus. Officers later found a .357 revolver loaded with six live rounds of ammunition in that location. A Baikal nine-millimeter pistol loaded with eight live rounds of ammunition was also found in the back seat. That weapon had been purchased by Fields' girlfriend, Rodgers, but he had been with her when she bought it. In addition to the two weapons, officers found 32.9 grams of crack cocaine sticking out of a circular hole in the passenger side of the wheel base in the Taurus station wagon's cargo area. A screwdriver was also found in the cargo area. Marks covering a similar cargo hole on the driver's side indicated that the screw driver was used to remove the caps covering the holes.

When other officers arrived at the scene, they observed Willis jumping on the back of one of the hostages and saw him hand off the TEC–9 nine-millimeter pistol to Donald Scaife, one of the owners of S & S, who placed the weapon in the trash can where it was subsequently found by the police. All of the occupants of the S & S station were asked to come out with their hands up. A search of Willis revealed, among other items, a crack pipe and two pagers. One of the children that had been held hostage identified Willis as the "bad guy" who had a gun and hit Jackson. The child also told officers that Willis had threatened his father, Alvin Salvage, at gunpoint.

Fields and Willis were charged with the following counts: (1) aiding and abetting a felon in possession of a firearm in violation of 18 U.S.C. §§ 2, 922(g), & 924(e)(1); (2) aiding and abetting possession of 33 grams of cocaine base in violation of 18 U.S.C. § 2 and 21 U.S.C. § 844; and (3) aiding and abetting the unlawful carrying of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 2 & 924(c). In addition, Fields was charged with a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The defendants pleaded not guilty to all charges.

Prior to trial, the government turned over witness statements, under seal, to the court for *in camera* review because many witnesses feared the ramifications of testifying against the defendants. All of these statements were provided to defense counsel shortly before trial except the pre-trial statement of W.W., one of the juveniles who had participated in the hostage crisis. After meeting with W.W.'s counsel, and reviewing W.W.'s statement to police, the magistrate judge ruled that the defendants were not entitled to W.W.'s statements until after W.W. testified. The defendants did not challenge that ruling or otherwise seek the disclosure of the testimony. W.W. did not testify at trial. After trial, W.W. told Amanda Lange, an investigator hired by Fields, that the drugs had been planted by the police and that neither Fields nor Willis had carried a gun.

At trial, each defendant testified in his own defense. Not surprisingly, their renditions of what took place on October 21, 1994, differed from the facts set forth above, which are derived from the testimony of victims and police officers.[2] On February 27, 1995, a jury found the defendants guilty on all counts charged.

After return of the verdict, defendants filed post-trial motions questioning the sufficiency of the evidence. Before ruling on these motions, the district court requested additional briefing on the sufficiency of the evidence regarding the drug charge against Willis. The district court subsequently upheld the jury verdicts. The district court also denied the defendants' other post-trial motions, including the motion for a new trial based on W.W.'s statements. Fields was sentenced to an aggregate prison term of 180 months. Willis was sentenced to an aggregate prison term of 322 months.

Fields and Willis appeal, contending that there was insufficient evidence to support the drug convictions and thus the section 924(c) convictions also fail. Fields argues that there was insufficient evidence to support the section 924(c) conviction. He also contends

that the government violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose W.W.'s statement. Willis asserts that he is entitled to a new trial because W.W.'s post-trial statement to Lange was unavailable to the defense before trial and should have been disclosed by the government. He also argues that the government's position that the defendants could have called W.W. as a witness negates the presumption of innocence.

## II. DISCUSSION

Although the defendants raise several issues in this appeal, we focus on three questions: (1) whether sufficient evidence supports the convictions on the drug count; (2) whether the section 924(c) convictions can stand in light of the Supreme Court's recent decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); and (3) whether withholding W.W.'s pre-trial statement violated *Brady* or whether W.W.'s post-trial statements provided grounds for a new trial. For the reasons discussed below, we affirm the convictions.

### A. Sufficiency of the Evidence

▇▇ We note that the defendants bear a heavy burden in attempting to overturn their convictions on appeal by challenging the sufficiency of the evidence. We review the evidence, in its entirety, in the light most favorable to the verdict and draw all reasonable inferences in favor of the verdict. *E.g., United States v. Rice,* 49 F.3d 378, 386 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2630, 132 L.Ed.2d 870 (1995). We will not weigh the evidence or assess the credibility of witnesses. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978). If the evidence rationally supports two conflicting hypotheses, we will not disturb the convictions. *United States v. O'Connell,* 841 F.2d 1408, 1424 (8th Cir.), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). "Indeed, this court may overturn the verdict only if the evidence properly viewed is such that a 'reasonable-

---

**2.** Because the defendants challenge the sufficiency of the evidence, we review the facts in the light most favorable to the government—i.e.,

those facts upon which a reasonable jury could have relied to convict the defendants.

minded [fact-finder] *must* have entertained a reasonable doubt as to the government's proof of one of the essential elements of the offense.'" *United States v. Johnson,* 18 F.3d 641, 645–46 (8th Cir.1994) (quoting *United States v. Holm,* 836 F.2d 1119, 1122 (8th Cir.1988) (emphasis in original)). Applying this standard to the present case, it is evident that we need not engage in a lengthy analysis regarding the felon in possession of a firearm convictions, which are clearly supported by sufficient evidence. Therefore, we focus instead on the drug-related convictions.

 Fields and Willis were convicted of aiding and abetting each other in the possession of approximately 33 grams of crack cocaine, found by police in plastic bags sticking out of a hole in the wheel well in the cargo area of Field's Taurus station wagon. *See* 18 U.S.C. § 2; 21 U.S.C. § 842. The defendants contend that they did not have possession of the drugs, which is an essential element of the crime. Possession can either be actual possession or constructive possession. To prove constructive possession, the government must demonstrate that the defendant had knowledge of, and control over, the drugs. *See Johnson,* 18 F.3d at 647. "Mere presence as a passenger in a car from which the police recover contraband or weapons does not establish possession." *United States v. Flenoid,* 718 F.2d 867, 868 (8th Cir.1983).

 Fields asserts that he did not have constructive possession of the drugs found in the Taurus because title to the automobile had not yet passed to him and because his girlfriend, Rodgers, usually drove the car. "A person has constructive possession of contraband if he has 'ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed.'" *United States v. Temple,* 890 F.2d 1043, 1045 (8th Cir.1989) (quoting *United States v. Matra,* 841 F.2d 837, 840 (8th Cir.1988)). Fields was undisputedly the driver of the car in which the drugs were found. Moreover, even if title had not yet passed to Fields, the bill of sale from Robin Auto Sales was found in the glove compartment confirming that the Taurus had been sold to Fields. Although the car might have been located behind the residence of Rodgers, Fields obviously was able to use the car any time he desired. Scratch marks on the caps to the holes in the wheel wells in the cargo area of the Taurus, along with the screwdriver, support an inference by the jury that Fields had transported drugs in the past and knew about the presence of the crack in the present case. Thus, the record reflects sufficient evidence to uphold Field's drug conviction.

 Willis also argues that he did not have actual or constructive possession of the drugs found in the Taurus. Although Willis's situation presents a closer question, sufficient evidence also supports his drug possession conviction. First, Jackson testified that he and Willis had repeatedly smoked crack cocaine together, including on October 21, 1994. Second, Jones testified that when she observed Willis on that date he appeared to be "tripping" just prior to terrorizing the S & S customers. Third, police officers arrested Willis and found a crack pipe on him when he was searched. Fourth, the bags of crack were visible and within an arm's reach from where Willis was riding in the back seat of the Taurus. Fifth, the screwdriver was also found near the location where Willis was sitting in the car. Finally, evidence, such as using a common address, demonstrated that Willis and Fields had known each other in the past. Taken together, these facts provide sufficient evidence to uphold Willis's drug conviction. Therefore, we reject the defendants' sufficiency of evidence challenges to their convictions.

**B. Section 924(c) Analysis under *Bailey***

 We next address Fields's contention that the evidence is insufficient to support the section 924(c) convictions. Fields asserts that the guns were present to facilitate the recovery of Willis's property and they were not therefore related to the drugs as required under 18 U.S.C. § 924(c), which states in relevant part: "Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm" is subject to imprisonment. 18 U.S.C. § 924(c)(1). Therefore, to convict on a section 924(c) count, the

government must prove that the defendant (1) used or carried a firearm (2) during and in relation with a drug trafficking crime.

■ Turning first to the second prong, we have previously held that simple possession of cocaine base can serve as the "drug trafficking" predicate under section 924(c). *See, e.g., United States v. Knox,* 950 F.2d 516, 518 (8th Cir.1991). Moreover, the defendants did not object to the jury instruction authorizing a section 924(c) conviction based upon a possession offense under 21 U.S.C. § 844. Therefore, the drug trafficking element exists and our analysis focuses on whether the defendants used or carried a firearm in connection with that drug trafficking crime. In the case before us, a reasonable juror could conclude from the evidence presented that the defendants brandished guns while holding the occupants of S & S hostage. A reasonable juror could also determine that the defendants transported guns in the Taurus, which contained the crack cocaine. We are called upon to determine whether such evidence satisfies the "use or carry" requirement of section 924(c)(1) in light of the Supreme Court's recent holding in *Bailey*.[3]

In *Bailey*, the U.S. Supreme Court held that the "use" prong of section 924(c)(1) "requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." —— U.S. at ——, 116 S.Ct. at 505. The two defendants in *Bailey* had been convicted under section 924(c)(1). The police had arrested one defendant after a routine traffic stop and found cocaine in the passenger compartment of his car and a loaded firearm in the locked trunk of the car. In an unrelated incident, the police arrested the second defendant when they found cocaine and an unloaded gun in a locked trunk in her bedroom closet while executing a search warrant. The Court concluded that these circumstances did not support a conviction under the "use" prong of section 924(c)(1). The

Court reasoned that the term "use" had been given such a broad meaning that it eliminated any function for the word "carry," the alternate term under the statute. *Id.* at ——, 116 S.Ct. at 507. The Court stated that "[a] defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs." *Id.* at ——, 116 S.Ct. at 508. Importantly, the Court expressly limited the scope of its holding in *Bailey* to the "use" prong of section 924(c). *Id.* at ——, 116 S.Ct. at 509. The Court also noted that while its interpretation of "use" restricted the scope of section 924(c)(1), other means remained available to prosecute people who mixed guns and drugs, including the "carry" prong of section 924(c)(1). Therefore, *Bailey* left the "carry" prong of section 924(c)(1) intact, as well as the pre-*Bailey* cases analyzing the "carry" prong.

■ In a pre-*Bailey* decision, we held that transporting a firearm in the passenger compartment of a vehicle satisfies the "carry" prong of section 924(c). *United States v. Freisinger,* 937 F.2d 383, 387 (8th Cir.1991). In upholding the section 924(c) conviction we noted that the defendant failed to offer a jury instruction defining "carry" and thus the ordinary meaning of the word should apply. *Id.* We have already highlighted several dictionary definitions of the word "carry" under section 924(c)(1) in a recent, post-*Bailey* opinion. *See United States v. White,* 81 F.3d 80, 83 (8th Cir.1996) (quoting, *inter alia,* Black's Law Dictionary 214 (6th ed. 1990), which defines "carry" as "[t]o have or bear upon or about one's person"). Therefore, the ordinary meaning of the word "carry" includes transporting firearms in the passenger compartment of a car loaded with drugs.

Several other circuits have relied upon our *Freisinger* decision in post-*Bailey* decisions to support the conclusion that transporting a firearm in the passenger compartment of a car satisfies the "carry" prong of section 924(c). *See United States v. Baker,* 78 F.3d 1241, 1247 (7th Cir.1996) (possession of a

---

**3.** Because we uphold the section 924(c) convictions we need not determine whether either defendant waived their *Bailey* challenge. Moreover, unlike our recent case of *United States v. McKinney,* 79 F.3d 105 (8th Cir.1996), Fields

properly raised the *Bailey* issue by challenging the sufficiency of the evidence of his section 924(c) conviction and thus has not waived that argument.

firearm coupled with the affirmative act of transporting it supported a section 924(c) conviction); *United States v. Farris,* 77 F.3d 391, 395–96 (11th Cir.1996) (transporting firearm in the glove compartment of a drug-laden car was sufficient to satisfy the "carry" prong of section 924(c)). In addition to holding that transporting a firearm in the passenger compartment of a drug-loaded car satisfies the "carry" prong of section 924(c)(1), another circuit has held in a post-*Bailey* decision that having a firearm immediately available for use—i.e., on the defendant's person or within reach—satisfies the "carry" prong. *See, e.g., United States v. Riascos-Suarez,* 73 F.3d 616, 623 (6th Cir.1996), *petition for cert. filed,* ——— U.S.L.W. ——— (U.S. June 11, 1996) (No. 95–9285). Because *Bailey* did not address the "carry" prong of section 924(c), our prior decision in *Freisinger* remains binding precedent on this court. *See Farris,* 77 F.3d at 395 n. 4.

Applying *Freisinger* to the present case, we conclude that the record contains sufficient evidence to support the section 924(c) convictions. Fields drove the Taurus which contained the crack cocaine. Willis rode in the back seat of the Taurus just in front of where the drugs were found. Witnesses testified that both defendants brandished firearms as they entered the S & S station. Police found two loaded firearms in the passenger compartment of the Taurus and one loaded firearm inside the S & S station. Thus, not only does the record demonstrate that the defendants transported firearms in the passenger compartment of a vehicle loaded with crack cocaine—which is enough to support a section 924(c) conviction—the record also reflects that the defendants brandished the firearms while terrorizing the S & S station occupants, only discarding the firearms when the police arrived. Even then, the guns remained readily accessible to the defendants, unlike the defendants in *Bailey.* Because the record demonstrates that the defendants *carried* firearms in connection

with a drug trafficking crime, we need not analyze the "use" prong of section 924(c). Thus, the *Bailey* issue concerning the term "use" under section 924(c) is not before us.

■■ Finally, we reject the defendants' contention that the firearms were not carried *in connection with* the drug trafficking crime. Clearly, had the police lawfully stopped the Taurus en route to the S & S station, the fact that they were transporting loaded firearms in the passenger compartment of the car and crack cocaine in the cargo area would have provided sufficient evidence to support section 924(c) convictions. *See, e.g., Freisinger,* 937 F.2d at 387. We will not reward the defendants by nullifying the section 924(c) convictions because they engaged in additional criminal conduct—namely, terrorizing the patrons of the S & S station at gunpoint. Fields and Willis embarked upon a criminal escapade with multiple objectives. The fact that they were caught by the police when they were holding the occupants of S & S hostage does not eliminate the fact that they transported loaded firearms in a car containing crack cocaine. In fact, Fields was already back in the drug-laden Taurus within reach of two loaded firearms when the police arrived. The record reflects that Fields told W.W. to hide something under the seat, where a gun was subsequently found. A person who brandishes a firearm while in possession of 32.9 grams of crack cocaine, or transports loaded firearms in the passenger compartment of a drug-filled car, has violated section 924(c)(1) and *Bailey* certainly does not mandate, or even suggest, a different result. Therefore, after examining our prior holding in *Freisinger* and considering the narrow scope of the Supreme Court's holding in *Bailey,* we affirm the section 924(c) convictions.[4]

### C. W.W.'s Statements

■ Fields and Willis also contend that a pre-trial statement to police by W.W., the

---

**4.** Because the defendants did not object to the section 924(c) jury instruction, we review it for plain error. *See, e.g., United States v. Webster,* 84 F.3d 1056, 1066 (8th Cir.1996). Although the pre-*Bailey* instruction was given to the jury (because *Bailey* had not been decided at the time of trial), it was not plain error in the present case because the defendants would have been convict-

ed even if the error had not been committed and thus the error would not have resulted in a miscarriage of justice that seriously affects the fairness of the judicial proceedings. *Id.; Baker,* 78 F.3d at 1246–47. Unlike our recent decision in *Webster,* the evidence in the case before us was overwhelming that the defendants both transported loaded firearms in the drug-laden Taurus

juvenile who had assisted the defendants in holding the occupants of S & S hostage, should have been disclosed to them. Trial counsel for W.W., who was prosecuted as a juvenile, moved to block disclosure of W.W.'s statements, which had been given to the court under seal along with other witness statements. W.W.'s attorney met, *ex parte,* with the district court judge. The magistrate judge issued an order on February 13, 1995, authorizing the government to disclose the victim statements to the defendants just prior to trial, but only authorized W.W.'s pre-trial statement to be disclosed pursuant to the Jencks Act after the juvenile testified.[5] Although W.W. was listed on the government's witness list as a potential witness, he did not testify at trial. After W.W.'s criminal case had been resolved, however, he consented to an interview with Amanda Lange, an investigator hired by Fields. She submitted an affidavit and a summary of the interview with W.W., in which he stated that neither defendant carried a firearm and he had not seen any drugs. W.W. stated that one of the guns found in the Taurus was his and that the police had planted the drugs. The defendants now assert that this post-trial statement was not available at the time of trial and was undoubtedly known to the government. According to the defendants, under either a newly discovered evidence theory or *Brady,* a new trial is warranted in light of W.W.'s pre-trial and post-trial statements. We disagree.

 The decision whether to sustain or overrule a new trial motion depends in large part on the amount of prosecutorial misconduct, if any, that occurred. *United States v. Duke,* 50 F.3d 571, 576 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 224, 133 L.Ed.2d 154 (1995). No issue of prosecutorial misconduct exists in this case. In order to grant a motion for a new trial based on newly discovered evidence, the court must deter-

mine that: (1) the evidence was in fact discovered after trial; (2) the failure to discover the evidence was not attributable to a lack of diligence by the movant; (3) the evidence would not be merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would likely produce an acquittal if a new trial were granted. *See, e.g., id.* at 576–77.

Assuming that W.W.'s post-trial statement was relevant, Fields and Willis fail to satisfy the remaining requirements, especially that the statement would likely produce an acquittal. First, although the defendants claim that W.W.'s statement was discovered after trial, W.W. accompanied the defendants on the day in question. The defendants surely knew what W.W. would say if he were to testify truthfully. Second, the defendants could have subpoenaed W.W. and obtained his testimony at trial. Their failure to do so indicates they were not diligent in obtaining W.W.'s rendition of what occurred. Third, W.W.'s post-trial rendition of the events in question was similar to the version set out by the defendants at trial. The jury obviously disbelieved the defendants' account and thus W.W.'s version would have simply been cumulative, or at best, it would have assisted in the impeachment of the numerous witnesses who testified against the defendants. Fourth, because the jury disbelieved the defendants' version of events, it is more than likely the jury would also have disbelieved a juvenile participant's claim that he saw no drugs and that neither defendant carried a gun. In fact, the district court found that W.W.'s post-trial statement directly conflicted with his pre-trial statement to police. Therefore, W.W.'s statement would not have changed the outcome of the trial. Accordingly, Fields and Willis failed to satisfy the requirements necessary to establish that they are entitled to a new trial based on newly discovered evidence.

and actually brandished the weapons, thereby satisfying the requirements of section 924(c)(1). Therefore, even if giving the pre-*Bailey* instruction to the jury constituted plain error, it would have been harmless in this case. *See, e.g., United States v. Price,* 76 F.3d 526, 529 (3d Cir.1996) (holding that giving pre-*Bailey* jury instruction on 924(c)(1) count was an erroneous statutory interpretation, but not constitutional in nature, and thus harmless error analysis applied).

5. The Jencks Act requires the government to provide a defendant, upon their motion, any statement or report made by a government witness that relates to the subject matter of the direct testimony of that witness. 18 U.S.C. § 3500. The government need not provide the statement, however, until after the witness testifies on direct examination. 18 U.S.C. § 3500(a).

Finally, we are called upon to determine whether the district court's decision to keep W.W.'s pre-trial statement under seal violated the defendants' due process rights as recognized under *Brady*. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. To find a *Brady* violation, therefore, the defendants must show: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendants; and (3) the evidence was material. *Duke*, 50 F.3d at 577.

To satisfy the materiality prong, the defendants must demonstrate a "reasonable probability" that the result of the trial would have been different if they had received W.W.'s pre-trial statement to the police. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985). A probability sufficient to undermine confidence in the conviction constitutes a "reasonable probability." *Id.* As we discussed above, W.W.'s post-trial statement to Lange, in which W.W. attempted to exonerate the defendants, would not have changed the outcome of the trial. After reviewing the statement, the district court noted that W.W.'s post-trial statement conflicted with his pre-trial statement to police. We have reviewed W.W.'s pre-trial statement to police and conclude that it is even less likely to change the outcome of the trial than his post-trial statement to Lange.[6] Moreover, the defendants knew that W.W. had given a statement to the police and that W.W. had actively participated in the events that took place at the S & S station. Finally, the district court contacted both defendants' attorneys prior to trial regarding its decision to

keep W.W.'s statement under seal and neither counsel appealed the order, moved for disclosure, issued a subpoena to W.W., or sought to depose him. In fact, defense counsel seized upon W.W.'s absence in closing argument and used it to imply a failure of proof on the part of the government. With these considerations in mind, we conclude that the defendants' rights under *Brady* were not violated.

## III. CONCLUSION

As discussed above, sufficient evidence supports the convictions. Having considered the remainder of the defendants' arguments, we find them to be without merit. Accordingly, we affirm the district court and deny all pending motions.

---

6. The district court's ruling was essentially a discovery matter, which we review for an abuse of discretion. *See, e.g., United States v. Byrne*, 83 F.3d 984, 990 (8th Cir.1996); *see also United States v. Phillips*, 854 F.2d 273, 278 (7th Cir. 1988) (holding that the district court did not abuse its discretion in concluding that the FBI informant's file contained no *Brady* material not already provided to the defendant in a summary). *But see United States v. Monroe*, 943 F.2d 1007,

1012 (9th Cir.1991) (applying the clear error standard), *cert. denied*, 503 U.S. 971, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992). Regardless of the applicable standard of review, we have reviewed W.W.'s pre-trial statement and conclude that it is not *Brady* material. *See Byrne*, 83 F.3d at 992; *Layton v. South Dakota*, 918 F.2d 739, 742 (8th Cir.1990), *cert. denied*, 499 U.S. 953, 111 S.Ct. 1429, 113 L.Ed.2d 480 (1991).