**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

———————

No. 97-2138

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Kenneth James Summers, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: October 22, 1997
Filed: February 25, 1998

———————

Before BEAM and FLOYD R. GIBSON, Circuit Judges, and WEBB,[1] District Judge.

———————

FLOYD R. GIBSON, Circuit Judge.

A jury convicted Kenneth James Summers of conspiring to distribute marijuana, cocaine, and methamphetamine, see 21 U.S.C. §§ 841(a)(1), 846 (1994), and using or carrying a firearm during and in relation to a drug trafficking offense, see 18 U.S.C. § 924(c)(1) (1994). The district court sentenced Summers to terms of 151 months and sixty months, to be served consecutively. Summers raises three arguments on appeal: (1) the government failed to present evidence sufficient to support his firearm conviction (2) the proof at trial materially varied from the charges in his indictment; and

———————

[1]The HONORABLE RODNEY S. WEBB, United States District Judge for the District of North Dakota, sitting by designation.

(3) the district court abused its discretion when it allowed the government to introduce evidence of prior bad acts. For the reasons set forth in this opinion, we affirm.

## I.      BACKGROUND

In the spring of 1993, Summers began working for Daniel Stevens's construction company. Shortly after Summers's employment commenced, he began selling small amounts of methamphetamine to Stevens. Eventually, Stevens abandoned his construction business and moved into Summers's home and received free methamphetamine in exchange for weighing and packaging drugs for Summers. Stevens testified that he delivered methamphetamine, cocaine, and marijuana for Summers from late 1993 until late summer of 1994. After further questioning, Stevens changed his testimony, and stated several times that he worked for Summers into the winter of 1994.

Through working with Summers, Stevens eventually met the Ortiz brothers: Eric, Ramon, and Roeles. The Ortiz brothers visited Summers's home on numerous occasions to deliver drugs and collect money. In the winter of 1994, Stevens began working for Eric Ortiz because he did not feel that Summers treated him fairly. Stevens testified that from November 4, 1994, the beginning of the alleged conspiracy, until he stopped working for Summers, the largest single receipt of methamphetamine Summers received from Eric Ortiz weighed ten pounds. While Stevens worked for Eric Ortiz, he once delivered three pounds of cocaine to Summers, and on another occasion, he delivered ten to fifteen pounds of methamphetamine. Stevens also stated that he once delivered between ten and fifteen pounds of marijuana to Summers.

At all times, Summers required Stevens to carry a gun. Stevens testified that Summers kept a twelve-gauge shotgun within reach at all times, and would often display the gun when meeting with others involved in the drug trade as a means of intimidation.

The government also presented the testimony of George Sholley, who stated that he had gone to Summers's home on three or four occasions to purchase marijuana and methamphetamine. George testified that in May or June of 1995, Summers came to George's home with several other people to collect money George's wife, Helen, owed him for previous drug purchases. During this visit, Summers and two other people in his group showed George the guns they were carrying and used threatening language. Summers apparently had his gun tucked into his waistband. Helen Sholley testified that she reprimanded Summers for wielding a gun at her home while her children were present. In response, Summers told Helen that he and the others did not carry weapons and that George must have been lying. Helen's testimony also indicated that the event may have occurred in the fall of 1994 rather than in the spring of 1995.

After hearing the evidence in the case, a jury convicted Summers of conspiring to distribute marijuana, cocaine, and methamphetamine, see 21 U.S.C. §§ 841(a)(1), 846, and using or carrying a firearm during and in relation to a drug trafficking offense, see 18 U.S.C. § 924(c)(1). The district court denied Summers's motion for a new trial. On appeal, Summers argues: (1) the government failed to present evidence sufficient to support his firearm conviction; (2) the proof at trial materially varied from the charges in his indictment; and (3) the district court abused its discretion when it allowed the government to introduce evidence of prior bad acts. Because we conclude that the district court[2] properly denied Summers's motion for a new trial, we affirm.

## II.  DISCUSSION

### A.  Firearm conviction

---

[2]The HONORABLE RONALD E. LONGSTAFF, United States District Judge for the Southern District of Iowa.

Summers's first argument on appeal is that the government failed to produce evidence sufficient to support his firearm conviction under § 924(c)(1). When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the jury verdict. See United States v. Purvis, 114 F.3d 737, 738 (8th Cir. 1997). "We will not weigh the evidence or assess the credibility of witnesses." United States v. Willis, 89 F.3d 1371, 1376 (8th Cir.), cert.denied, 117 S. Ct. 273 (1996). Moreover, we will "uphold the jury verdict if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." Purvis, 114 F.3d at 738-39.

To sustain a conviction under § 924(c)(1), the government must prove that the defendant used or carried a firearm during and in relation to a drug trafficking crime. See 18 U.S.C. § 924(c)(1); Willis, 89 F.3d 1377-78. To convict a defendant under the "use" prong of § 924(c)(1), the government must present "evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." Bailey v. United States, 116 S. Ct. 501, 505 (1995) (emphasis in original). "The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 508.

In this case, the government presented evidence sufficient to establish that Summers "used" or carried a firearm during and in relation to a drug trafficking offense. First, Stevens testified that Summers required him to carry a weapon at all times in an effort to provide protection for their drug trafficking activities. Based on principles of coconspirator liability, Summers is "criminally liable for the substantive offenses committed by another conspirator within the scope and in furtherance of the conspiracy." United States v. Rodger, 100 F.3d 90, 91 n.2 (8th Cir. 1996) (per curiam), cert. denied, 118 S. Ct. 145 (1997). The government presented evidence that Stevens, while working for Summers, carried his gun at all times. The government also presented evidence that Stevens continued to work for Summers after November 4,

-4-

1994, the date the government charged that the conspiracy began. Thus, the jury reasonably could have inferred that Stevens carried a firearm during and in relation to the conspiracy. Summers would, therefore, be liable for the firearm count based on Stevens's offense of carrying a firearm under § 924(c)(1).

Second, Stevens testified that Summers often conducted drug transactions with a firearm displayed on the coffee table as a means of intimidation. Stevens's trial testimony illustrates the point:

A. I guess if that's your meaning of use, they were displayed all of the time.

Q. By whom?

A. Well, [Summers] used to have a shotgun out, sometimes he'd have that old .38 thing laying on the coffee table, or I would have the 9-millimeter.

Q. These guns would be out in the open when the customers would come?

A. I didn't leave mine out, but he did a lot.

Q. Do you know why?

A. To intimidate people, I guess.

Summers's App. at 41. As the Supreme Court clarified in Bailey, displaying a firearm satisfies the "use" prong of § 924(c)(1). See Bailey, 116 S. Ct. at 508. Though the trial testimony did not establish exact dates that Summers displayed the firearms, the jury reasonably could have inferred that, because Summers displayed firearms "a lot," at least one such incident likely occurred after the conspiracy began in November of 1994. Stevens continued to work for Summers for at least a short period of time after the

conspiracy began, and he still dealt with Summers after he began working for Eric Ortiz. Therefore, Stevens's testimony supports the reasonable inference that Summers displayed a firearm during the scope of the charged conspiracy.

Finally, George Sholley testified that Summers came to his home in May or June of 1995, during the conspiracy, to collect money Helen Sholley owed him for previous drug purchases. George testified that, during this meeting, Summers had a gun tucked into his waistband and referred to it in threatening ways. Summers contends that Helen Sholley's testimony seemed to indicate that George lied about Summers's carrying a weapon. Her testimony also called into question whether the incident occurred during the time frame of the conspiracy. However, the jury heard the testimony of both George and Helen Sholley. It is likely that the jury credited George's testimony over Helen's, and we will not review questions of witness credibility on appeal. See Willis, 89 F.3d at 1376. A jury verdict will stand "if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." Purvis, 114 F.3d at 738-39. We conclude that the government presented evidence sufficient to support the jury's determination that Summers used or carried a firearm during and in relation to the conspiracy.

### B.    Variance

Summers contends that the government's proof at trial materially varied from the charges contained in his indictment. Summers's primary complaint is that the indictment charged that the conspiracy began "on or about November 4, 1994," Summer's App. at 6, but the government's evidence referred primarily to acts which occurred prior to November 4, 1994. Summers also asserts that the events occurring before November 4, 1994, evidenced one conspiracy, while the indictment charged a separate conspiracy beginning on November 4, 1994. He argues that the evidence of the first conspiracy created a "spillover" effect which prejudiced his case.

An indictment is sufficient "if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993), cert. denied, 513 U.S. 831 (1994). Summers argues that a fatal variance occurred in his case because a substantial portion of the government's evidence referred to events occurring before November 4, 1994 -- the date the indictment charged that the conspiracy began. Summers claims that he could not have known he would have to defend against the pre-November 4 evidence. We note, however, that "a variance between the date in the indictment and the proof is not fatal if the proof shows that the acts charged were committed on a date within the statute of limitations and prior to the return date of the indictment." United States v. Prescott, 33 F.3d 922, 923-24 (8th Cir. 1994) (quotation and citation omitted).

Summers also contends that a variance occurred because the government's evidence established multiple conspiracies when the indictment charged a single conspiracy. "A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement." United States v. Morales, 113 F.3d 116, 118-19 (8th Cir. 1997) (quotation and citations omitted). If the jury finds "one overall agreement to commit an illegal act, the evidence establishes a single conspiracy." United States v. Reagan, 940 F.2d 1134, 1135 (8th Cir. 1991). "In determining whether a variance exists, we consider the totality of the circumstances, including the nature of the activities, the location and time frame in which the activities were performed, and the participants involved." Morales, 113 F.3d at 119. After a careful review of the evidence presented at trial, we conclude that the government established the existence of a single, ongoing conspiracy to distribute methamphetamine, cocaine, and marijuana between Summers, Stevens, and the Ortiz brothers, as well as others. The only significant change which occurred was that Stevens went from reporting to Summers to reporting to Eric Ortiz. The pre-November 4 evidence introduced by the government was merely background evidence which tended to show how the

conspiracy developed in its initial stages. See United States v. Heidebur, 122 F.3d 577, 579 (8th Cir. 1997). Therefore, we cannot conclude that the pre-November 4 evidence created a variance.

### C.    Evidence of Prior Bad Acts

Summers also argues that the district court erred when it admitted evidence of events occurring prior to November 4, 1994 because that evidence was beyond the scope of the charged conspiracy. Therefore, he claims, such evidence should have been excluded as evidence of prior bad acts under Fed. R. Evid. 404(b). We review a district court's decision to admit evidence of a defendant's prior bad acts for an abuse of discretion. See United States v. Tomberlin, 130 F.3d 1318, 1320 (8th Cir. 1997).

We conclude that the evidence Summers complains of -- the pre-November 4, 1994 evidence -- is evidence of "bad acts that form the factual setting of the crime in issue," Heidebur, 122 F.3d at 579 (quotation omitted), which does not come within Rule 404(b)'s coverage at all, see id. Therefore, we cannot conclude that the district court abused its discretion in admitting such evidence.

## III.    CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's judgment.


A true copy.

    Attest:


        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-