USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1043 No. 96-1669 UNITED STATES OF AMERICA, Appellee, v. DONALD E. CLEVELAND, Defendant, Appellant. ____________________ No. 96-1128 UNITED STATES OF AMERICA, Appellee, v. RAMON E. VASQUEZ, Defendant, Appellant. ____________________ No. 96-1659 UNITED STATES OF AMERICA, Appellee, v. ENRIQUE GRAY-SANTANA, Defendant, Appellant. ____________________ ERRATA The published opinion of this Court issued on February 18, 1997, is amended as follows: Page 4: insert as line 1, the following: "to eight kilograms of cocaine from co-defendant Juan Rodriguez" Page 5, 4th line from bottom: delete comma after "Acosta" UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1043 No. 96-1669 UNITED STATES OF AMERICA, Appellee, v. DONALD E. CLEVELAND, Defendant, Appellant. ____________________ No. 96-1128 UNITED STATES OF AMERICA, Appellee, v. RAMON E. VASQUEZ, Defendant, Appellant. ____________________ No. 96-1659 UNITED STATES OF AMERICA, Appellee, v. ENRIQUE GRAY-SANTANA, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Bownes, Senior Circuit Judge. ____________________ ____________________ Inga S. Bernstein and John H. Cunha, by Appointment of the Court, _________________ _____________ with whom Norman S. Zalkind, Zalkind, Rodriguez, Lunt & Duncan and __________________ __________________________________ Salsberg, Cunha & Holcomb, P.C. were on consolidated briefs for __________________________________ appellants Enrique Gray-Santana and Donald E. Cleveland. Oliver C. Mitchell, Jr. with whom Donnalyn B. Lynch Kahn and _________________________ ________________________ Goldstein & Manello, P.C. were on brief for appellant Ramon E. ____________________________ Vasquez. Andrea Nervi Ward, Assistant United States Attorney, with whom __________________ Donald K. Stern, United States Attorney, was on briefs for the United ________________ States. ____________________ February 18, 1997 ____________________ CAMPBELL, Senior Circuit Judge. Ramon E. Vasquez _____________________ appeals from his conviction by a jury for conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. 846 and for possession of cocaine with intent to distribute in violation of 21 U.S.C. 841. He contends that the district court erred in denying his motion to suppress certain physical evidence and in omitting "hesitate to act" language from its reasonable doubt instruction.  Enrique Gray-Santana and Donald Cleveland, who were Vasquez's co-defendants, pleaded guilty to attempting to possess cocaine with intent to distribute in violation of 21 U.S.C. 846 and 841(a) and to carrying or using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c)(1). As their guilty pleas permit, they now appeal from the district court's denials of their motions to suppress and motions in limine. They also appeal from the district court's denial of relief from their 924(c)(1) convictions for carrying or using a firearm in relation to a drug crime. They argue that their guilty pleas and convictions should be invalidated under Bailey v. United ______ ______ States, ___ U.S. ___, 116 S. Ct. 501 (1995), a decision ______ handed down by the Supreme Court shortly after acceptance of their guilty pleas. I. Background -4- Most of the facts are not in dispute. Gray-Santana ("Gray"), a resident of New York City, arranged to secure five to eight kilograms of cocaine from co-defendant Juan Rodriguez (not a present appellant). Gray intended to sell the cocaine through other contacts he had in Boston, so he arranged to take delivery in Boston. On the morning of October 18, 1994, Gray travelled by bus to Boston, planning to meet Cleveland. Cleveland picked Gray up in a rented white Mazda 929 he had borrowed from a friend and took him to his house. There, Cleveland and Gray placed three loaded handguns inside a Louis Vuitton duffel bag and put the bag inside the Mazda's trunk. The two planned to use the guns to rob their suppliers of their cocaine. At around 4 p.m., Cleveland and Gray were paged by Rodriguez. They then left in the Mazda to meet Rodriguez in the Symphony Hall area of Boston. At this time, the Drug Enforcement Administration was investigating one Juan Pagan. The DEA had information that Pagan was shipping large amounts of cocaine from Puerto Rico to New England. On October 17, 1994, heightened phone activity led DEA Agents to begin physical surveillance, including videotaping, of the Connecticut apartment complex where Juan Pagan resided. Around noon on October 18, 1994, two cars arrived at the complex. The first was a Lexus, -5- driven by William Acosta with Vasquez in the back seat. The second was a Lincoln, driven by Rodriguez. After the cars parked, Rodriguez handed Acosta a black bag and then Acosta took the bag up to Pagan's apartment. Vasquez, carrying a cellular phone, got out of the Lexus and sat with Rodriguez in the Lincoln. After ten or fifteen minutes, Acosta came back and spoke to Vasquez, prompting Vasquez and Rodriguez to leave the complex in a brown Oldsmobile driven by one Jorge Quinones. An hour or so later, Vasquez returned in the Oldsmobile, followed by Rodriguez in a white Isuzu Trooper. The DEA had received information from two confidential sources that Pagan used a white Isuzu Trooper in his drug operations. These informants had also told the DEA that some of Pagan's vehicles had hidden compartments used to hold drugs. One of the informants had stated that Pagan's white Isuzu Trooper had such a hidden compartment under the rear seat. After the Isuzu arrived, Acosta and Rodriguez were observed examining its back seat area. Acosta then left, driving the Lexus with Vasquez in the back seat. Rodriguez followed them in the Isuzu. The two cars drove to Boston on major highways, staying close to 55 miles per hour. DEA agents followed them the entire way. -6- After the caravan arrived in the Symphony Hall area of Boston, Acosta and Rodriguez parked the cars. Acosta then used the Lexus to guide Cleveland and Gray, who had arrived in the Mazda, to where the Isuzu was parked. Acosta drove away, and Vasquez was next observed sitting in the back seat of the Mazda. Gray exited the Mazda and got into the Isuzu. Vasquez got into the front seat of the Mazda. The two cars began to drive off. At this point, the DEA agents blocked them. The agents ordered the occupants of both cars to exit their vehicles and handcuffed them. The agents then moved the suspects and their cars out of traffic to a nearby parking lot. The agents searched the Isuzu and found six kilograms of cocaine in a concealed compartment underneath the back seat. They then searched the Mazda and found the bag in the trunk containing the three guns, rope and duct tape. At that point, the four men were told they were under arrest. A few hours after his arrest, while he was in custody, Gray gave a statement to DEA agent Bruce Travers confessing to participation in the events described above.  Vasquez filed a motion to suppress the physical evidence found on his person at the time of his arrest. The district court denied his motion. Vasquez was tried by a jury and convicted of conspiracy to possess cocaine with -7- intent to distribute and of possession of cocaine with intent to distribute. The court sentenced him to 121 months in prison. Cleveland and Gray eventually pled guilty to attempting to possess cocaine with intent to distribute and to carrying or using a firearm during and in relation to a drug trafficking crime, subject to their right to appeal any adverse ruling by the district court on their motions to suppress physical evidence and to suppress Gray's post-arrest statement. The district court denied their motions and sentenced each of them to 180 months in prison and 60 months of supervised release.1 After the Supreme Court came down with its Bailey decision, 116 S. Ct. 501, Cleveland and Gray ______ moved in the district court for relief from the conviction for carrying or using a firearm in relation to a drug trafficking crime. The court denied that motion. II. Vasquez A. The Search of Vasquez's Person: __________________________________ In his first point of error, Vasquez argues that the district court erred in denying his motion to suppress the physical evidence the agents found on his person. This included a pager, address book, business cards, and notes tying Vasquez to the other defendants. He contends that a  ____________________ 1. Rodriguez pleaded guilty to conspiracy and possession charges and was also sentenced to 120 months in prison and 60 months of supervised release. -8- wrongful de facto arrest occurred when he was initially ordered out of the Mazda and handcuffed. (Only later was Vasquez told he was under arrest and thereafter searched, by which time the cocaine had been discovered in the Isuzu.) Because the initial de facto arrest was allegedly without probable cause, Vasquez argues that it was illegal and that it tainted all subsequent events, causing the later search of his person to violate the Fourth Amendment. The district court held, however, and we agree, that the agents had probable cause to arrest Vasquez at the time they ordered him out of the Mazda and handcuffed him. Accordingly, regardless of whether the arrest occurred then or later, the arrest was legal and the subsequent search of his person was proper. "[I]t is well established that '[i]f an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.'" United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir.) _____________ ________________ (quoting United States v. Uricoechea-Casallas, 946 F.2d 162, _____________ ___________________ 165 (1st Cir. 1991)), cert. denied, 115 S. Ct. 193 (1994).  ____________ "Law enforcement officers may effect warrantless arrests provided that they have probable cause to believe that the suspect has committed or is committing a crime." United States v. Martinez-Molina, 64 F.3d 719, 726 (1st Cir. _____________ _______________ 1995) (citing United States v. Watson, 423 U.S. 411, 416-18 _____________ ______ (1976); Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975)). ________ ____ -9- "[The government] need only show that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." Torres-Maldonado, 14 F.3d at 105. See also ________________ _________ Beck v. Ohio, 379 U.S. 89, 91 (1964). ____ ____ "Of course, probable cause must exist with respect to each person arrested, and 'a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.'" Martinez-Molina, 64 F.3d at 726 (quoting Ybarra v. _______________ ______ Illinois, 444 U.S. 85, 91 (1979)). "[C]ases in which courts ________ find that probable cause exists generally involve substantially more than a momentary, random, or apparently innocent association between the defendant and the known criminal activity." Martinez-Molina, 64 F.3d at 727 _______________ (discussing cases). Here, prior to seizing Vasquez, the agents had been investigating Pagan and his drug trafficking operations for several years. Before the events of this case, the agents had learned from informants that Pagan was trafficking in kilogram quantities of cocaine, shipping it from Puerto Rico to Hartford, Connecticut and Springfield, Massachusetts. The agents had learned that Pagan used couriers to transport the cocaine. Some of Pagan's couriers had been arrested at the -10- San Juan airport with several kilograms of cocaine in their luggage and had admitted to working for Pagan. Two confidential informants who had each proved reliable in related matters had told DEA agents that among the many vehicles Pagan used to transport drugs and money was a white Isuzu Trooper. They each also related that Pagan's transport vehicles often had a concealed, electronically- controlled compartment used to hide whatever was being moved. One of them asserted that he had seen that the white Isuzu Trooper had such a compartment in the floor under the rear seat. The agents had also learned from one of the informants and from other sources that Pagan's girlfriend lived in apartment D-219 at the Connecticut apartment complex and that Pagan used that apartment in his drug activities. The apartment was listed under the name "J. Pagan." The DEA had installed a pen register on the apartment's phone so they could track calls made to and from that number. On October 17, 1994, the pen register revealed a sharp increase in phone activity from the Connecticut apartment. Some of the numbers being called matched cellular phone and beeper numbers that the agents knew belonged to Pagan's previously identified drug associates. The agents decided to begin physical surveillance of the Connecticut apartment. This surveillance included agents stationed -11- around the apartment complex and two agents who were equipped with a video camera in an apartment that had a view of Pagan's apartment. A little after noon on October 18th, the agents observed a Lexus and a Lincoln Town Car enter the apartment's parking lot. The various movements of people and vehicles that followed, coupled with the DEA's information about Pagan's drug dealing, strongly indicated that a drug transaction was taking place. Acosta, who had been driving the Lexus, entered Pagan's apartment building followed by Rodriguez, carrying a large black shoulder bag. Rodriguez handed this bag to Acosta in the building's lobby. Later on, the agents saw Acosta talking to Pagan on Pagan's balcony. Vasquez exited the Lexus and walked over to Rodriguez and the Lincoln carrying a cellular phone, one of the "well known tools of the drug trade." United States v. _____________ De La Cruz, 996 F.2d 1307, 1311 (1st Cir.), cert. denied, 510 __________ ____________ U.S. 936 (1993). See also Martinez-Molina, 64 F.3d at 728. ________ _______________ Vasquez waited with Rodriguez inside the Lincoln until Acosta came out with another man, Jorge Quinones, and spoke to Vasquez. Then Quinones left, returning shortly in a brown Oldsmobile. Vasquez and Rodriguez got into the Oldsmobile and drove out of the complex. An hour or so later Vasquez and Quinones returned, followed by Rodriguez in a white Isuzu Trooper, exactly the -12- car the agents had been told Pagan used to transport drugs and drug proceeds. It was also the vehicle said to have a hidden compartment for drugs and money in the floor under the rear seat. While Pagan stood on his balcony overlooking the parking lot, Acosta and Rodriguez were seen to be looking into the Isuzu's back seat area, where the secret compartment was said to be located. At this point, the agents had probable cause to believe that Vasquez, Rodriguez, Acosta, Pagan, and Quinones were involved in a drug transaction, with the Isuzu Trooper likely bearing the contraband. Rather than arrest the suspects immediately, the agents chose to follow the Isuzu Trooper and the Lexus as they drove to Boston. What happened thereafter beginning with the drive in tandem to Boston and ending with the agents' intervention was wholly consistent with the existence of an unfolding drug transaction and Vasquez's active involvement. Vasquez and Rodriguez stood on a Boston street corner, apparently checking the area for police. Later, and after the agents had seen Acosta speak to Cleveland and Gray, the agents spotted Vasquez inside the Mazda, to which he had moved from the Lexus. Vasquez was still inside the Mazda with Cleveland when the agents stopped the vehicles and ordered everyone out. -13- By this time, the agents had abundant evidence to constitute probable cause that Vasquez was involved in an ongoing drug trafficking crime and that his association with the other suspects was not momentary, random, or innocent. They had authority, therefore, at the time he was ordered from the Mazda and handcuffed, to arrest Vasquez. The district court did not err in refusing to suppress the various items later found on Vasquez's person when he was searched. B. The Reasonable Doubt Instruction: ____________________________________ Vasquez asserts that the district court erred in refusing to include "hesitate to act" language in its reasonable doubt instruction. In particular, Vasquez insists that, upon his objection to the omission, the court should have complied with his request to tell the jury, "When we talk about a reasonable doubt, we mean a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act."  The short answer to this argument is that this court has explicitly held that a district court's refusal to include "hesitate to act" language in its explanation of reasonable doubt to the jury does not constitute reversible error. See United States v. Vavlitis, 9 F.3d 206, 212 (1st ___ _____________ ________ Cir. 1993); United States v. O'Brien, 972 F.2d 12, 15 (1st _____________ _______ Cir. 1992). Although we accepted an instruction that -14- included such language in United States v. Drake, 673 F.2d _____________ _____ 15, 21 (1st Cir. 1982), we have also criticized the "hesitate to act" formulation. See Gilday v. Callahan, 59 F.3d 257, ___ ______ ________ 264 (1st Cir. 1995) (characterizing the "hesitate to act" language as "arguably unhelpful"), cert. denied, 116 S. Ct. ____________ 1269 (1996); O'Brien, 972 F.2d at 15-16 (criticizing _______ instructions such as the "hesitate to act" formulation which compare reasonable doubt to the decisional standard used by individual jurors in their own affairs as trivializing the constitutionally required burden of proof).  The Supreme Court has stated that the Constitution does not require district courts to define reasonable doubt, nor does it require trial courts who do choose to explain the term to employ "any particular form of words . . . in advising the jury of the government's burden of proof." Victor v. Nebraska, 511 U.S. 1, 5 (1994). "Rather, 'taken as ______ ________ a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.'" Id. (quoting Holland v. ___ _______ United States, 348 U.S. 121, 140 (1954)). _____________ In instructing the jury on reasonable doubt, the district court stated: As I have said, the burden is upon the Government to prove beyond a reasonable doubt that a defendant is guilty of the charge made against the defendant. It is a strict and heavy burden, but it does not mean that a defendant's guilt must be proved beyond all possible doubt. It does require that the evidence exclude -15- any reasonable doubt concerning a defendant's guilt. A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence. Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge. Of course, a defendant is never to be convicted on suspicion or conjecture. If, for example, you view the evidence in the case as reasonably permitting either of two conclusions one that a defendant is guilty as charged, the other that the defendant is not guilty you will find the defendant not guilty. It is not sufficient for the Government to establish a probability, though a strong one, that a fact charged is more likely to be true than not true. That is not enough to meet the burden of proof beyond reasonable doubt. On the other hand, there are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. Concluding my instructions on the burden, then, I instruct you that what the Government must do to meet its heavy burden is to establish the truth of each part of each offense charged by proof that convinces you and leaves you with no reasonable doubt, and thus satisfies you that you can, consistently with your oath as jurors, base your verdict upon it. If you so find as to a particular charge against a defendant, you will return a verdict of guilty on that charge. If, on the other hand, you think there is a reasonable doubt about whether the defendant is guilty of a particular offense, you must give the defendant the -16- benefit of the doubt and find the defendant not guilty of that offense. This explanation correctly conveyed the concept of reasonable doubt to the jury. III. Cleveland and Gray A. The Vehicle Searches: ________________________ In their first point of error, Cleveland and Gray argue that the district court erred in refusing to grant their motion to suppress the evidence found in the agents' search of the Isuzu Trooper and of the Mazda. "A police officer may effect a warrantless search of the interior of a motor vehicle on a public thoroughfare as long as he has probable cause to believe that the vehicle contains contraband or other evidence of criminal activity." United States v. Staula, 80 F.3d 596, 602 (1st Cir.), cert. _____________ ______ _____ denied, 117 S. Ct. 156 (1996). See also California v. ______ _________ __________ Acevedo, 500 U.S. 565, 570 (1991); Chambers v. Maroney, 399 _______ ________ _______ U.S. 42, 46-52 (1970); United States v. Martinez-Molina, 64 _____________ _______________ F.3d 719, 730 (1st Cir. 1995). When the police have probable cause to search a vehicle, they may also search closed containers within that vehicle. See Acevedo, 500 U.S. at ___ _______ 569-81. Even assuming that Cleveland and Gray have standing to contest the searches in this case, a problematic proposition in itself, the agents clearly had probable cause -17- to search the vehicles. As explained in Part II-A, above, by the time the agents stopped the two cars, they had probable cause to believe that the defendants were involved in a drug transaction and that the Trooper contained contraband. The movements of the Mazda in following the Lexus to rendezvous with the Isuzu, when combined with the exchange of personnel Gray moving into the Isuzu and Vasquez entering the Mazda provided the agents with probable cause to believe that Cleveland and Gray were also involved in the drug transaction and that the Mazda contained contraband. The warrantless search thus did not violate the Fourth Amendment, and the district court did not err in refusing to suppress the evidence found in the two vehicles. B. Gray's Statement: ____________________ In the next point of error, Gray asserts that the district court should have suppressed the statement he made to Agent Travers in the DEA office after his arrest. Gray claims that he had invoked his right to counsel before making the statement and that the agents coerced the statement from him through intimidation. The district court, after holding two evidentiary hearings at which it heard the testimony of Gray, Agent Travers, and another agent present at DEA headquarters the night of Gray's arrest, concluded that Gray's various allegations of coercive activity by the agents were not -18- credible. The court also found that Gray had initiated the conversation with the agents that led to his confession by knocking on the door of his cell. Gray then told Agent Travers that he wished to speak with him about the events leading up to his arrest and signed a written waiver of his rights. After examining the record, we believe that these findings of fact by the district court were not clearly erroneous. See United States v. Valle, 72 F.3d 210, 213-14 ___ ______________ _____ (1st Cir. 1995) ("In reviewing orders granting or denying suppression motions, this court scrutinizes a district court's factual findings, including its credibility determinations, for traces of clear error."). In this case, as in Valle, "whether or not to _____ suppress the challenged statements boils down to a credibility call" and "[s]uch calls are grist for the district court's mill." Valle, 72 F.3d at 214. Since Gray _____ initiated the contact with the agents that led to his statement after he had invoked his right to counsel, the district court was correct to deny the motion to suppress. See Edwards v. Arizona, 451 U.S. 477, 484-86 (1981) (holding ___ _______ _______ that once a defendant has asked for an attorney, she is not subject to further interrogation by the police until after counsel has been made available to her unless she herself initiates further communication with the authorities); United ______ States v. Fontana, 948 F.2d 796, 805-06 (1st Cir. 1991) ______ _______ -19- (noting that initiation of interrogation by the accused has been broadly interpreted); Watkins v. Callahan, 724 F.2d _______ ________ 1038, 1042 (1st Cir. 1984) (stating that "an accused is not powerless to countermand an election to talk to counsel").  Similarly, we find no clear error in the district court's determination that the agents did not commit the coercive acts alleged by Gray. See United States v. Burns, ___ _____________ _____ 15 F.3d 211, 216 (1st Cir. 1994) ("Although the ultimate issue of voluntariness is a question of law subject to plenary review, we will accept the district court's subsidiary findings of fact unless they are 'clearly erroneous.'"). Based on the facts as found by the district court, the court's holding that Gray's statement was voluntary and therefore admissible at trial under 18 U.S.C. 3501 was proper. The court applied the totality of the circumstances test mandated by 18 U.S.C. 3501(b), paying particular attention to the factors identified by that section.2 Gray  ____________________ 2. 18 U.S.C. 3501(b) states: (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such -20- gave his statement within six hours of his arrest, bringing this case within the rule of 3501(c).3 The court found that Gray knew the nature of the offense of which he was suspected at the time he made the confession; knew that he was not required to make any statement and that any statement he did make could be used against him; and had been advised prior to the questioning of his right to the assistance of counsel. The court acknowledged that Gray had been without the assistance of counsel when he gave his statement, but held that in this case, this fifth factor was heavily  ____________________ defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. The presence or absence of any of the above- mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession. 3. 18 U.S.C. 3501(c) states, in relevant part: (c) In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest . . . shall not be inadmissible solely because of delay in bringing such person before a magistrate . . . if such confession was made or given by such person within six hours immediately following his arrest or other detention . . . . -21- outweighed by the other four factors and by the case's particular circumstances. We agree with the district court that Gray's statement was voluntary. C. The "Carry" Issue: _____________________ Cleveland and Gray pleaded guilty to violating 18 U.S.C. 924(c)(1). That statute imposes a five-year prison term on anyone who, "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." 18 U.S.C. 924(c)(1). After the Supreme Court's opinion in Bailey, they both sought revocation of their ______ convictions based on guilty pleas to the 924(c)(1) charges. Gray, against whom judgment had not yet entered, filed an unsuccessful Motion to Correct Sentence under Fed. R. Crim. P. 35(c), and Cleveland, against whom judgment had entered and whose direct appeal was already pending, filed an equally unavailing motion under 28 U.S.C. 2255. The various appeals were consolidated. The government does not dispute our jurisdiction to consider on the merits Cleveland and Gray's claims that their guilty pleas are invalid in light of Bailey. Since we reject those claims, we do not address any ______ potential jurisdictional question stemming from Cleveland's  2255 appeal. The broad definition of "use" formerly employed by this circuit and under which Cleveland and Gray pleaded -22- guilty was unanimously disapproved by the Supreme Court in Bailey. Stating the need to interpret statutory terms in ______ accordance with their "ordinary or natural" meaning, the Court relied on the dictionary definition of "use" in holding that a conviction under the "use" prong of the statute could only be upheld if the defendant "actively employed the firearm during and in relation to the predicate crime." Bailey, 116 S. Ct. at 506-509. Mere possession or storage of ______ the weapon is insufficient. Id. at 508-09. ___ Under Bailey, Cleveland and Gray cannot be ______ convicted under 924(c)'s "use" prong. The guns remained in the Mazda's trunk throughout the events in question; neither Cleveland nor Gray "actively employed" the firearm. Their guilty pleas might still, however, be upheld under the statute's "carry" prong. While Bailey did not address the requirements ______ relative to "carry," the Supreme Court stated that part of its rationale for defining "use" more narrowly was to preserve a separate, nonsuperfluous meaning for "carry." Bailey, 116 S. Ct. at 507. The Court wrote, "Under the ______ interpretation we enunciate today, a firearm can be used without being carried, e.g., when an offender has a gun on ____ display during a transaction, or barters with a firearm without handling it; and a firearm can be carried without being used, e.g., when an offender keeps a gun hidden in his ____ -23- clothing throughout a drug transaction." Id. at 507. The ___ Court remanded the case for a determination of whether a defendant could be convicted under the "carry" prong either for having a gun inside a bag in a locked car trunk or for having an unloaded firearm in a locked footlocker inside a bedroom closet. Id. at 509. ___ Bailey leaves us with two questions concerning the ______ proper interpretation of "carry." First, must a firearm be on a suspect's person to be "carried" or can one also "carry" a firearm in a vehicle? Second, if one can "carry" a firearm in a vehicle, must the weapon be immediately accessible to the defendant to be "carried"? The first question is easily answered. We have already held post-Bailey that a firearm can be "carried" in a ______ boat, a conveyance that seems indistinguishable for present purposes from a land vehicle like a car. United States v. ______________ Ramirez-Ferrer, 82 F.3d 1149 (1st Cir.), cert. denied, 117 S. ______________ ____________ Ct. 405 (1996).  This result accords both with our pre-Bailey ______ "carry" cases and with the holdings of the other circuits to have considered this issue post-Bailey. See, e.g., United ______ __________ ______ States v. Plummer, 964 F.2d 1251, 1252-54 (1st Cir.) ______ _______ (acknowledging the defendant-driver's concession that the presence of a gun in his vehicle either in the driver's seat or on the front passenger seat was sufficient to establish -24- that he had "carried" a gun under 924(c)(1)), cert. denied, ____________ 506 U.S. 926 (1992); United States v. Eaton, 890 F.2d 511, ______________ _____ 511-12 (1st Cir. 1989) (acknowledging the defendant's concession that he had "carried" a gun for the purposes of  924(c)(1) when the gun had been under the front seat of the truck he was driving), cert. denied, 495 U.S. 906 (1990); _____________ United States v. Giraldo, 80 F.3d 667, 677-78 (2d Cir.) ______________ _______ (upholding a 924(c)(1) conviction for "carrying" a gun in a car), cert. denied, 117 S. Ct. 135 (1996); United States v. ____________ ______________ Mitchell, No. 95-5792, 1997 WL 12115, at *2-4 (4th Cir. Jan. ________ 15, 1997) (same); United States v. Fike, 82 F.3d 1315, 1327- _____________ ____ 28 (5th Cir.) (stating that a gun may be "carried" in a car), cert. denied, 117 S. Ct. 241-42 (1996); United States v. ____________ _____________ Riascos-Suarez, 73 F.3d 616, 623 (6th Cir.) (same), cert. ______________ _____ denied, 117 S. Ct. 136 (1996); United States v. Molina, 102 ______ _____________ ______ F.3d 928, 930-32 (7th Cir. 1996) (same); United States v. _____________ Willis, 89 F.3d 1371, 1377-79 (8th Cir.) (same), cert. ______ _____ denied, 117 S. Ct. 273 (1996); United States v. Staples, 85 ______ _____________ _______ F.3d 461, 464 (9th Cir.) (same), cert. denied, 117 S. Ct. 318 ____________ (1996); United States v. Miller, 84 F.3d 1244, 1256-61 (10th _____________ ______ Cir.) (same), cert. denied, 117 S. Ct. 443 (1996); United ____________ ______ States v. Farris, 77 F.3d 391, 395 (11th Cir.) (upholding a  ______ ______ 924(c)(1) conviction for "carrying" a gun in a car), cert. _____ denied, 117 S. Ct. 241 (1996). ______ -25- On the second question, we agree with the Fourth, Seventh and Tenth Circuits that a gun may be "carried" in a vehicle for the purposes of 924(c)(1) without necessarily being immediately accessible to the defendant while it is being transported. See Miller, 84 F.3d at 1260; Molina, 102 ___ ______ ______ F.3d at 930-32; Mitchell, at *3. ________ Since Bailey, this Circuit has twice faced ______ questions concerning the scope of the statute's "carry" prong. In United States v. Manning, 79 F.3d 212 (1st Cir.), _____________ _______ cert. denied, 117 S. Ct. 147 (1996), we held that carrying a _____________ briefcase containing a gun, pipe bombs, drugs, and drug paraphernalia was sufficient to fulfill the "carry" requirement. In Ramirez-Ferrer, already noted, we held that ______________ a loaded revolver covered by a T-shirt within the defendant's reach on a cocaine-laden boat upon which the defendant was travelling was being "carried" for the purposes of  924(c)(1). In neither case, however, did we have to decide whether a firearm in a vehicle in which a defendant is travelling needs to be within easy reach to be "carried" for the purposes of 924(c)(1). Since some circuits have, since Bailey, continued ______ to rely upon their pre-Bailey "carry" case law, we look at ______ ours as well, but find no case that is entirely on point. See, e.g., United States v. Castro-Lara, 970 F.2d 976, 982-83 _________ _____________ ___________ (1st Cir. 1992) (upholding a conviction under 924(c)(1) -26- when the gun was in a briefcase in a locked car trunk without specifying whether the conviction was under the statute's "use" or "carry" prong), cert. denied, 508 U.S. 962 (1993); ____________ Plummer, 964 F.2d at 1252-54 (acknowledging the defendant- _______ driver's concession that the presence of a gun in his vehicle either in the driver's seat or on the front passenger seat was sufficient to establish that he had "carried" a gun under 924(c)(1)); Eaton, 890 F.2d at 511-12 (acknowledging the _____ defendant's concession that he had "carried" a gun for the purposes of 924(c)(1) when the gun had been under the front seat of the truck he was driving). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993). In Bailey, _____ _____________ ______ the Supreme Court turned to the dictionary for help in determining the meaning of "use," Bailey, 116 S. Ct. at 506, ______ so we do the same with "carry." Webster's Third New International Dictionary of the ___________________________________________________ English Language Unabridged 343 (3d ed. 1971) defines "carry" ___________________________ as, "1: to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging: sustain as a burden or load and bring along to another place." Webster's goes on to list many other _________ definitions of the word and then, in differentiating "carry" from some of its synonyms, states: -27- CARRY indicates moving to a location some distance away while supporting or maintaining off the ground. Orig. indicating movement by car or cart, it is a natural word to use in ref. to cargoes and loads on trucks, wagons, planes, ships, or even beasts of burden. Id. This definition, therefore, clearly includes the ___ transport of a firearm by car; the concept of whether or not the carried item is within reach plays no part in the definition. Black's Law Dictionary 214 (6th ed. 1990) defines _______________________ "carry" as, "To bear, bear about, sustain, transport, remove, _________ or convey. To have or bear upon or about one's person, as a ______ watch or weapon; locomotion not being essential . . . ." (emphasis supplied). However, Black's defines the specific _______ phrase "carry arms or weapons" more narrowly as, "To wear, bear, or carry them upon the person or in the clothing or in a pocket, for the purpose of use, or for the purpose of being armed and ready for offensive or defensive action in case of a conflict with another person." Id. ___ The latter Black's definition of "carry arms or _______ weapons" limits "carrying" to the defendant's person and so at least implies accessibility. However, even the circuits which have read an immediate accessibility requirement into "carry" under 924(c)(1) have never limited the statutory language to "carrying" a firearm on the person. Indeed, such circuits, like the others to confront the issue, have all -28- upheld convictions for "carrying" a weapon in a car. See ___ United States v. Cruz-Rojas, 103 F.3d 283, 286 (2d Cir. 1996) _____________ __________ (remanding two "carry" convictions to determine if a gun under a car's dashboard was accessible to either defendant); Riascos-Suarez, 73 F.3d at 623 (upholding a "carry" ______________ conviction when the gun was in a car near the driver's seat); United States v. Willett, 90 F.3d 404, 406-07 (9th Cir. 1996) _____________ _______ (holding that a gun transported in a car was "carried" because it was easily accessible). We strongly doubt given the omnipresence of automobiles in today's world and in drug dealing, and given the basic meaning of "carry" as including transport by vehicle that Congress, in prescribing liability for anyone who "uses or carries" a firearm during or in relation to a drug trafficking offense, meant to exclude a defendant who transports the gun in his car, rather than on his person, for use in a drug transaction. Hence the Black's Law Dictionary ______________________ restricted definition of the phrase "carry arms or weapons" seems inapposite here. It is true, of course, that to come under  924(c)(1), "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Smith, 508 U.S. at 238. In certain circumstances, a _____ firearm's immediate accessibility to a defendant might be -29- relevant to determining whether or not he was carrying it "during and in relation to" a drug trafficking crime, as the statute requires. 18 U.S.C. 924(c)(1). But a firearm need not always be instantly accessible in order to be carried "during and in relation to" a drug trafficking crime. Here, the evidence shows that the defendants had placed the three firearms in question in the Mazda's trunk and, when arrested, were carrying them for the purpose of using them to rob their suppliers during the ongoing drug trafficking crime. Evidence of this purpose plainly demonstrated the necessary nexus to the drug trafficking offense wholly apart from whether the guns were within the immediate reach of those seated in the car at the time they were stopped by the agents.  As noted above, the Fourth, Seventh, and Tenth Circuits have held that a gun does not need to be readily accessible to be "carried" in a vehicle. See Mitchell, at ___ ________ *2-4; Molina, 102 F.3d at 930-32; Miller, 84 F.3d at 1256-61. ______ ______ Other circuits, while not explicitly deciding the issue one way or the other, appear to be leaning toward adopting the same approach. See United States v. Pineda- ___ _____________ _______ Ortuno, 952 F.2d 98, 103-04 (5th Cir.) (a pre-Bailey case ______ ______ holding that the circuit's cases requiring a showing that the gun was within the defendant's reach during the commission of the drug offense did not apply when the gun was "carried" in -30- a vehicle), cert. denied, 504 U.S. 928 (1992); United States ____________ _____________ v. Fike, 82 F.3d 1315, 1327-28 (5th Cir. 1996) (a post-Bailey ____ ______ case upholding a defendant's conviction under 924(c)(1) for "carrying" a gun that was within his reach in a car but not stating that accessibility was a requirement); United States _____________ v. Rivas, 85 F.3d 193, 194-96 (5th Cir.) (same), cert. _____ _____ denied, 117 S. Ct. 593 (1996); United States v. Willis, 89 ______ _____________ ______ F.3d 1371, 1377-79 (8th Cir. 1996) (relying on pre-Bailey ______ case law to hold that transporting a firearm in the passenger compartment of a vehicle satisfies the "carry" prong of  924(c)(1) but not addressing the weapon's accessibility); United States v. Caldwell, 97 F.3d 1063, 1068-70 (8th Cir. _____________ ________ 1996) (upholding a conviction under 924(c)(1)'s "carry" prong for a case in which the defendant's gun was in a car's hatchback, an area the court regarded as within the car's occupants' reach); United States v. Farris, 77 F.3d 391, 395 ______________ ______ (11th Cir. 1996) (relying on pre-Bailey case law to uphold a ______ 924(c)(1) conviction for a defendant who was sitting in the back seat of a car while the firearm in question was in the glove compartment but not discussing whether the defendant could easily have reached the gun). We recognize that the Second, Sixth, and Ninth Circuits have taken a contrary position, requiring that the firearms be immediately accessible. See Giraldo, 80 F.3d at ___ _______ -31- 676-78; Riascos-Suarez, 73 F.3d at 623-24; Staples, 85 F.3d ______________ _______ at 464. We find the reasoning of these courts unpersuasive. In Giraldo, the Second Circuit relied entirely on _______ its pre-Bailey case United States v. Feliz-Cordero, 859 F.2d ______ ______________ _____________ 250 (2d Cir. 1988), in holding that a gun transported in a vehicle must be immediately accessible to be "carried." But Feliz-Cordero merely stated that "carry" should be given its _____________ literal meaning. The court thought that the literal meaning of "carry," when the "carrying" was done by a vehicle, required the gun to be within reach during the commission of the drug offense. Feliz-Cordero, 859 F.2d at 253. The court _____________ did not refer to any authority for this proposition and cited to only one case, United States v. Brockington, 849 F.2d 872 _____________ ___________ (4th Cir. 1988). Brockington does not so much as mention an ___________ immediate accessibility requirement, nor does it discuss the meaning of "carry." The only relevance Brockington has to ___________ this issue is that that panel upheld the "carry" conviction of a taxi cab passenger who had a loaded pistol under the floormat beneath his seat.  The Sixth Circuit in Riascos-Suarez inferred the ______________ immediate availability requirement from the Supreme Court's admonitions in Bailey that "use" must mean more than ______ "possession," Bailey, 116 S. Ct. at 508, and that a defendant ______ could not be charged under 924(c)(1) for mere storage of a weapon, id. The easy reach requirement, the Riascos-Suarez ___ ______________ -32- panel reasoned, is necessary to distinguish "carry" from possession and storage. Riascos-Suarez, 73 F.3d at 623. ______________ We disagree. We question the degree to which an easy reach requirement would differentiate "carry" from "possess." More importantly, we agree with the Tenth Circuit that the distinguishing characteristic of "carry" is not the instant availability of the item carried, but the fact that the item is being moved from one place to another by the carrier, either personally or with the aid of some appropriate vehicle. See Miller, 84 F.3d at 1260. ___ ______ The Ninth Circuit's decision in Staples relied _______ primarily on its earlier opinion in United States v. ______________ Hernandez, 80 F.3d 1253, 1256-58 (9th Cir. 1996) (holding _________ that a gun in a locked toolbox was not "carried" under  924(c)(1)), in stating that a firearm had to be immediately available for use to be "carried" in a vehicle. The Hernandez panel looked to find the ordinary or natural _________ meaning of "carry." But its quotation from Webster's _________ definition of "carry," supra, was selective, omitting the _____ definition's references to vehicles. The court also quoted from Black's definition of the single phrase, "carry arms or _______ weapons," supra, and cited the Sixth Circuit's Riascos-Suarez _____ ______________ opinion. As we have discussed, however, the ordinary meaning of the term "carry" includes transport by vehicle and affords no basis for imposing an accessibility requirement. -33- Turning to the case before us, both Cleveland and Gray pled guilty to using or carrying a weapon during and in relation to a drug trafficking offense. They do not now contend, nor could they, that the three loaded handguns found in the trunk of their car alongside rope and duct tape were unrelated to the drug trafficking offense they were committing at the time they were apprehended. In fact, Cleveland admitted at the suppression hearing that he and Gray intended to use the guns to rob the drugs from their suppliers. Their challenge to their convictions on the  924(c)(1) charge consists solely of the claim that, after Bailey, they can not be convicted under the statute's "use" ______ prong and that a conviction under the "carry" prong would require the guns to have been easily accessible. As under the standard definition of "carry" the guns were being "carried," and as we can see no basis for holding that the guns' lack of instant accessibility precluded them from being "carried," we affirm Cleveland's and Gray's convictions for violations of 18 U.S.C. 924(c)(1). Affirmed. ________ -34-