**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Leon Clifford FOSTER, Defendant–
Appellant.**

No. 89–10405.

United States Court of Appeals,
Ninth Circuit.

Jan. 5, 1998.

Miquel Rodriguez, Assistant United States Attorney, Sacramento, California, for Plaintiff–Appellee.

Michael R. Levine, Assistant Federal Public Defender, Portland, Oregon, for Defendant–Appellant.

Before: HUG, Chief Judge, and BROWNING, FLETCHER, KOZINSKI, THOMPSON, TROTT, FERNANDEZ, T.G. NELSON, KLEINFELD, TASHIMA and THOMAS, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

What does it mean to "carry a gun"? We must choose between two duelling interpretations of the phrase.

I

Leon Foster and Sandra Ward manufactured methamphetamine. In 1989 the police got wise to them, pulled Foster over while he was driving his pickup truck and arrested him. In his truck bed, in a zipped up bag under a snap-down tarp, they found a loaded 9 mm semiautomatic and a bucket. Inside the bucket were a scale, plastic baggies, and some hand-written notes with prices.

Foster and Ward were convicted of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Foster was also convicted of possessing methamphetamine, in violation of 21 U.S.C. § 844, and of carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). We overturned the conspiracy conviction in an unpublished memorandum disposition, but that decision was vacated, *United States v. Foster*, 513 U.S. 983, 115 S.Ct. 477, 130 L.Ed.2d 391 (1994), in light of an intervening Supreme Court case. On remand, we affirmed across the board. *United States v. Foster*, 57 F.3d 727, 729 (9th Cir. 1995).

The Supreme Court thereafter decided *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), which interpreted the "uses … a firearm" prong of section 924(c)(1). Foster now could not be convicted of using a firearm, as he did not actively employ the gun during and in relation to his drug trafficking crime. *Id.* at 141–43, 116 S.Ct. at 505. But, he was never charged with using—only with carrying—and *Bailey* does not authoritatively answer whether he can be convicted of carrying a firearm. Our three-judge panel issued a new opinion in light of *Bailey*, holding that Foster did not carry the gun, *United States v. Foster*, 96 F.3d 1177 (1996), but that opinion was withdrawn. *Id.* at 1178. We were left with the 1995 decision. We took the case en banc to resolve a conflict in our caselaw over the interpretation of carrying a firearm when a gun is found in a vehicle. *Compare United States v. Barber*, 594 F.2d 1242 (9th Cir.1979) with *United States v. Hernandez*, 80 F.3d 1253 (9th Cir.1996).

II

Section 924(c)(1) provides that "[w]hoever, during and in relation to any crime of violence or drug trafficking crime … uses *or carries* a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years…." (emphasis added). Was Leon Foster carrying a gun when he drove with it in his truck bed?

"Carry" seems like a simple English word, which is precisely the problem: Few words in English are truly simple. "Carry" has two differing relevant uses. It may mean to transport or even to arrange for something to be transported: "I had to carry my piano all the way across the country." But it may also mean to hold an object while moving from one place to another: "I carried that ball and chain wherever I went." This narrower sense applies particularly to weapons. If I were to say "Don Corleone is carrying a gun"—or even just "Don Corleone is carrying"—you would understand that the Don has a sidearm somewhere on his person. A synonym for carry in this sense is to "pack heat." Criminals who pack heat are obviously much more dangerous than those who do not.

In our caselaw, we first adopted the broad definition of "carry" as transporting in *United States v. Barber*, 594 F.2d 1242 (9th Cir. 1979). Interpreting section 924(c)(1)'s predecessor, we said "[i]n ordinary usage, the verb 'carry' includes transportation or causing to be transported. Nothing in the legislative history indicates that Congress intended any hypertechnical or narrow reading of the word 'carries.'" *Id.* at 1244. After *Bailey* we switched to the narrower (packing heat) sense in *United States v. Hernandez*, 80 F.3d 1253 (9th Cir.1996). We held that "in order for a defendant to be convicted of 'carrying' a gun in violation of section 924(c)(1), the defendant must have transported the firearm on or about his or her person…. This means the firearm must have been immediately available for use by the defendant." *Id.* at 1258 (citations omitted). A number of recent cases follow the *Hernandez* definition: *United States v. Lopez*, 100 F.3d 98, 101 (9th

Cir.1996); *United States v. Steinberg,* 99 F.3d 1486, 1494 (9th Cir.1996); *United States v. Loaiza–Diaz,* 96 F.3d 1335, 1336 (9th Cir. 1996); *United States v. Willett,* 90 F.3d 404, 407 (9th Cir.1996); *United States v. Staples,* 85 F.3d 461, 464 (9th Cir.1996).

Choosing between the two definitions is a close call.[1] One need go no farther than *Black's Law Dictionary* to find ammunition for both sides—but a bit[2] more for the narrower definition. The broad construction gets some support from the first part of the definition: "To bear, bear about, sustain, transport, remove, or convey." *Black's Law Dictionary* 214 (6th ed. 1990). But, the definition continues: "To have or bear upon or about one's person, as a watch or weapon; locomotion not being essential." *Id.* Moreover, *Black's* separately defines to "carry arms or weapons" as "[t]o wear, bear, or carry them upon the person or in the clothing or in a pocket, for the purpose of use, or for the purpose of being armed and ready for offensive or defensive action in case of a conflict with another person." *Id.* Because we are concerned here with carrying weapons, not furniture or grudges, the sense specific to weapons carries (so to speak) more weight.

There are those who have criticized the narrow definition because it seems to exonerate a defendant who has a gun readily accessible within the passenger compartment of a moving car, but not actually borne upon his person. These critics have smugly pointed out that circuits purporting to follow the narrow definition have had to abandon it in order to uphold convictions in such circumstances. *See, e.g., United States v. Cleveland,* 106 F.3d 1056, 1067 (1st Cir.), *cert. granted,* —— U.S. ——, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997) (citing *Willett,* 90 F.3d at 406–07, among other cases). This criticism is ill-founded. The key aspect of the narrow

definition is not that the weapon actually be borne on the person. Rather, it is that the weapon remain within easy reach while the individual is in motion.[3] Where an individual is walking, a gun in hand certainly amounts to carrying, but so does a gun in a holster or a shopping bag. The essence is that the weapon moves with the person and can be swiftly put to use. Where the individual is in a car, he need not actually be touching the weapon to make it move with him.[4] Because the car and its contents move in unison, any weapon that is within hand's reach while the car is in motion can be said to be carried. The same would be true, of course, if the individual had the weapon concealed in a train compartment, a bus or, heaven forfend, an airplane.

*Bailey* is the leading case on section 924(c)(1), so we can also look to how it analyzed "use" for clues to, our similar puzzle. The Court first considered the ordinary, dictionary meaning. *See* 516 U.S. at 143–45, 116 S.Ct. at 506. When that yielded several interpretations—as it does for "carry"—the Court looked to "placement and purpose in the statutory scheme." *Id.* The Court stressed that since Congress used two distinct terms, they must be defined narrowly enough that neither swallows[5] up the other. Under the correct definition, then, there must be some ways to use a gun but not carry it, and others to carry a gun but not use it. *Id.* at 145–47, 116 S.Ct. at 507. The *Bailey* Court therefore defined "use" narrowly as "active employment." Yet there is nothing special about "use" that makes it susceptible to a narrow definition, while parallel terms of the same statute are defined broadly; it just so happens that "use" came before the Court, not "carry." Construing the two terms in pari materia, we see no basis for defining "carry" broadly while "use" is defined narrowly.

---

**1.** "Close call" is another expression with dual meanings: A decision that can go either way or narrowly avoiding misfortune, such as being shot at and missed by someone carrying a gun.

**2.** Variously defined as a small amount, a device put in a horse's mouth or half of a quarter.

**3.** A lack of motion helped the defendant in *United States v. Henson,* 123 F.3d 1226 (9th Cir.

1997), where we held that lying on top of a gun on the couch was not carrying it.

**4.** The car might be thought of as a large, self-propelled shopping bag containing both the gun and the individual.

**5.** Eat up, not small birds.

The Court also looked to context within the broader statute. *Id.* at 145–47, 116 S.Ct. at 507. It examined how "use" was used in 18 U.S.C. § 924(d) and argued that the term should have the same meaning in section 924(c)(1). "Carry," unlike "use," does not appear elsewhere in section 924, so we get no help there. However, the Court did note that the term "use," if defined too broadly, would become synonymous with "possess"—a term that Congress used elsewhere. *Id.* at 143–45, 116 S.Ct. at 506. A broad reading of "carry" presents a similar danger by making it synonymous with "transport." As with "possess," Congress used "transport," "transporting" and "transportation" at many places in the gun statutes. *See, e.g.,* 18 U.S.C. §§ 922(a)(1)(A), 922(a)(1)(B), 922(a)(2), 922(a)(3), 922(a)(4), 922(a)(5), 922(e), 922(f)(1), 922(g), 922(h), 922(i), 922(j), 922(k), 922(n), 924(b), 925(a)(1), 925(a)(2), 925(a)(4). If Congress meant "transport" in section 924(c), it knew how to say so.

Another lesson we draw from *Bailey* is that, just as "use" may not be defined so broadly as to encompass mere possession, neither may "carry." The *Barber* interpretation comes dangerously close to doing this by prohibiting possession of a gun in a moving vehicle.[6] Cases adopting the broad definition point out that this prohibits possession *in a moving vehicle,* not possession period. *See Cleveland,* 106 F.3d at 1068. But it's not clear why possession in a moving vehicle is any different from possession anywhere else. Thus, a gun without bullets, partially disassembled, in a locked compartment to which the driver does not have the key would also be deemed to be carried under the broad definition; we think that is as much naked possession as the situation in *Bailey* itself. The broad definition, then, encompasses something close to the mere possession the Supreme Court in *Bailey* said was not within the scope of section 924(c)(1).[7]

We can also speculate[8] as to what purpose a prohibition on carrying a gun during and in relation to a violent or drug trafficking crime might serve.[9] Using or carrying guns makes those crimes more dangerous. A drug dealer who packs heat is more likely to hurt someone or provoke someone else to violence. A gun in a bag under a tarp in a truck bed poses substantially less risk. Indeed, *Black's* definition of carrying a weapon focuses on the "purpose of use, or ... the purpose of being armed and ready for offensive or defensive action in case of a conflict with another person." *Black's Law Dictionary* at 214.

Other circuits are split on the issue. The Second and Sixth follow the narrow definition. *See United States v. Giraldo,* 80 F.3d 667, 676 (2nd Cir.1996) ("[A] person cannot be said to 'carry' a firearm without at least a showing that the gun is within reach during the commission[10] of the drug offense.") (citation omitted); *United States v. Riascos–Sua-*

6.  A vehicle in motion, not a vehicle used to carry furniture, nor a vehicle that evokes strong feelings of empathy.

7.  That said, it is unlikely that *Bailey's* holding directly and obviously decides the question before us. One of the cases before the Court in *Bailey* squarely posed the question of a gun carried in a car, yet the Court remanded for consideration of the carry prong. *See Bailey,* 516 U.S. at 149–51, 116 S.Ct. at 509.

8.  There is mercifully little legislative history on "carry" to burden our discussion. The original version of the section was added as a floor amendment by Representative Poff. *See United States v. Anderson,* 59 F.3d 1323, 1327 (D.C.Cir. 1995) (en banc). The general aim of the section seems to have been to ensure that violent criminals receive longer sentences, and to deter the use of guns. *See* 114 Cong.Rec. 22,231 (1968) (remarks of Representative Poff); *see also id.* at

22,230 (remarks of Representative Casey) and at 22,234 (remarks of Representative Harsha). The only references to "carry" concerned a proposed amendment to delete the word, apparently because it might affect people such as policemen who were authorized to carry a gun, then committed an assault without using the gun. "Carry" was deleted from Representative Casey's version of section 924(c)(1), but eventually Representative Poff's version, "carry" included, passed. *See United States v. Ramirez,* 482 F.2d 807, 814 (2nd Cir.1973).

9.  That is, serve in the sense of aiding, not what Martina Navratilova or Julia Child are so good at.

10.  Commission may also refer to something like a committee or (in the military) an appointment, but here it is used in the sense of carrying out an activity—not carrying out in the sense of carrying a gun, though.

*rez,* 73 F.3d 616, 623 (6th Cir.1996) ("[T]he firearm must be immediately available for use—on the defendant or within his or her reach."). The First, Fourth, Seventh, and Tenth Circuits use a broader test along the lines of *Barber. See Cleveland,* 106 F.3d at 1066 ("[A] gun may be 'carried' in a vehicle ... without necessarily being immediately accessible to the defendant while it is being transported."); *United States v. Mitchell,* 104 F.3d 649, 653–54 (4th Cir.1997); *United States v. Molina,* 102 F.3d 928, 932 (7th Cir.1996); *United States v. Miller,* 84 F.3d 1244, 1259–60 (10th Cir.1996), *overruled on other grounds, United States v. Holland,* 116 F.3d 1353 (10th Cir.1997). Other circuits [11] have not clearly adopted any rule. *See, e.g., United States v. Fike,* 82 F.3d 1315, 1328 (5th Cir.1996) (gun under driver's seat was carried); *United States v. Willis,* 89 F.3d 1371, 1378–79 (8th Cir.1996) (gun in passenger compartment was carried); *United States v. Farris,* 77 F.3d 391, 395–96 (11th Cir.1996) (passenger in backseat may be found to have "carried" gun in glove compartment). Recently the Eighth Circuit said it would "assume, without deciding" that it had a ready availability requirement, then held that a gun in a well behind the driver's seat was readily available, and hence carried. *See United States v. Nelson,* 109 F.3d 1323, 1326 (8th Cir.1997). Thus, circuits all over the map are all over the map on the issue.

■ On balance, the arguments point to the narrower definition: It fits the more specific dictionary definition, follows *Bailey* more closely, harmonizes better with the full statute, and flows from the likely purpose of section 924(c)(1). We recognize, though, that reasonable minds may differ. A final argument for the narrower definition is the rule of lenity. Where a criminal law is ambiguous, we are wary of imposing criminal liability for conduct that the law does not clearly

prohibit. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *see also United States v. Latimer,* 991 F.2d 1509, 1514 (9th Cir.1993) ("The rule of lenity is rooted in 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' ") (citations omitted).

■ The rule of lenity applies only where a statute has resisted the ordinary tools of statutory interpretation. *See Hanlester Network v. Shalala,* 51 F.3d 1390, 1397 (9th Cir.1995) ("Canons of statutory construction, such as the Rule of Lenity, are employed only where 'reasonable doubt persists about a statute's intended scope even *after* resort [12] to the language, and structure, legislative history and motivating policies of the statute.' ") (citations omitted) (emphasis in original). We think these ordinary tools of interpretation point to the narrow definition; at worst (for Mr. Foster) they leave the scope of section 924(c)(1) in doubt. If Congress wants us to put people like Leon Foster in prison for a longer time, it can re-write the law to give us clearer instructions, perhaps by using the word "transport" in section 924(c)(1) as it does in various other sections of the firearm statutes.

■ We reaffirm our holding in *Hernandez* and its progeny that "in order for a defendant to be convicted of 'carrying' a gun in violation of section 924(c)(1), the defendant must have transported the firearm on or about his or her person.... This means the firearm must have been immediately available for use by the defendant." *Hernandez,* 80 F.3d at 1258.

### III

■ General rule in hand, we must next ask whether Foster's gun was immediately available for use.[13] It wasn't. While driving

---

**11.** Electricians use this word in a quite different way than lawyers. Some would say that our use is closer to that of musicians and comedians.

**12.** Resort sometimes refers to a vacation destination, but not here.

**13.** The dissent argues we must review only for plain error, which is not error that occurs where the rain in Spain mainly stays. The government

has not argued this point, but even under plain error review we would have to reverse Foster's conviction. The dissent only contests whether the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States,* — U.S. —, —, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (internal quotation omitted). *See* dissent at 716. It does, since Foster's "conviction and punishment

Foster could not reach the gun. To use the gun he would have had to stop the truck, get out, go to the back of the truck, open a snap-down tarp, and unzip the bag containing the gun. Although he might do this, he could not do so nearly as quickly as if he had had the gun within easy hand's reach. If that counts as immediately available, then one could never take a trip [14] with a gun in a vehicle without it being immediately available. It would make absolutely no sense to adopt the *Hernandez* rule but hold that this gun was immediately available—the practical effect of such a holding would be to return us to *Barber*.[15]

We therefore **REVERSE** the conviction for carrying a firearm and **REMAND** for resentencing. We **VACATE** that portion of the panel opinion which deals with the section 924(c) conviction. *See Foster*, 57 F.3d at 730. We leave the remainder of that opinion intact.

TROTT, Circuit Judge dissenting, with whom Chief Judge HUG and Judge T.G. NELSON join.

My good friend Judge Kozinski sings a Sirens' song. Nevertheless, I respectfully believe he leads us astray with inventive but obfuscatory conceits. Instead of attacking in a straightforward analytical way the meaning of "carry" in the context of a motor vehicle, he casts the proposition as a "duel" carried on in a language—English no less—too subtle to understand. The everyday bread and butter word "carry" takes on metaphysical proportions so diaphanous and illusive that we throw the rule of lenity as a life raft to sinking drug traffickers. The method Judge Kozinski uses to force his one-size-fits-all conclusion reminds me of a debate a wise lawyer once warned me to eschew: is it midnight gray, or is it battleship gray? Moreover, the majority sidesteps the appropriate appellate review of this issue pursuant to the plain error test, relegating plain error analysis to the afterthought of a footnote. In so doing, the majority permits a defendant who *conceded* the carrying issue at trial simply to walk away from it on appeal.

This is not a "puzzle," and we do not need "clues" to solve it. It's "carry," that's all, and it's carry in a vehicle during and in relation to a drug trafficking crime. Ambiguous? Slippery? Elusive? Or is this a case of "nothing either good or bad but thinking makes it so." [1] I mean no disrespect to Judge Kozinski. He is a readable writer, and he is not alone. The Second and Sixth Circuits have made the same mistake, the mistake Judge Learned Hand warned against of viewing this as solely a verbal problem rather than one with roots and consequences in the real world. Learned Hand, *Spirit of Liberty* 81 (3d ed. 1974).

### What does carry mean?

We have a perfectly good case on the books, the *Barber* case, that not only reaches the right result with respect to the word "carry" in a vehicle case, but illuminates the flaws in Judge Kozinski's analysis. In *United States v. Barber*, 594 F.2d 1242 (9th Cir. 1979), we addressed the very issue presented here. Barber had been arrested with a gun

---

are for an act that the law does not make criminal. There can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'presents exceptional circumstances[.]' " *Davis v. United States*, 417 U.S. 333, 346–47, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974).

**14.** A journey, not a fall or a chemically altered state of consciousness.

**15.** The dissent, but not the government, also raises the possibility that Foster carried the gun not while driving his truck, but earlier when he took the gun *to* the truck. *See* dissent at 714–15. One has to be wary when inferring conduct from other conduct (as opposed to inferring state of mind from conduct). How do we know that

Foster, and not someone else, took the gun to the truck? How do we know when that person carried it there, and whether it was during and in relation to the crimes? Foster said, "I did have a pistol in the back of the truck," but that admits only possession, not carrying, and it says nothing about how the gun got to the truck. There's not enough evidence on this record to find Foster guilty beyond a reasonable doubt on this theory, since the government never developed the facts necessary to prove it. The government proceeded on the theory that showing Foster had the gun in the truck was enough to prove carrying—as it was under our caselaw at the time.

**1.** Shakespeare, Hamlet, Act 2, Scene 2, 239–51.

in a locked glove compartment, and we were called upon to decide whether the gun was "carried" under 18 U.S.C. § 924(c)(2), the predecessor to § 924(c)(1). We said,

> Although Congress never specifically addressed the question whether the term "carries" was intended to encompass "transports" or "possesses," we think that the ordinary meaning of the term embraces Barber's transportation of the weapon. *In ordinary usage, the verb "carry" includes transportation or causing to be transported. Nothing in the legislative history indicates that Congress intended any hypertechnical or narrow reading of the word "carries."*

*Id.* at 1244 (emphasis added).

This holding embracing the "transportation test" made as much sense then as it does now. The word "carry" derives etymologically from the Latin word "carrus." Carrus, in turn, means cart, or vehicle. We recognize this Latin root in words such as car, carriage, and cart. *Webster's Third New International Dictionary of the English Language Unabridged* 343 (3d ed. 1971) (*"Webster's"*), upon which in its Second Edition the Supreme Court relied in *Bailey v. United States,* 516 U.S. 137, 143–45, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995) and *Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993). *Webster's* defines "carry" as, "1: to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging: sustain as a burden or load and bring along to another place." *Webster's* at 343. *Webster's* lists many other definitions of the word and then, in differentiating "carry" from some of its synonyms, states:

> CARRY indicates moving to a location some distance away while supporting or maintaining off the ground. Orig. indicating movement by car or cart, *it is a natural word to use in ref. to cargoes and loads*

*on trucks,* wagons, planes, ships, or even beasts of burden.

*Id.* (emphasis added).[2]

This definition, therefore, clearly includes the transportation of a firearm by car or by truck; whether the item carried is within reach is irrelevant.

We followed *Barber* in *United States v. Streit,* 962 F.2d 894 (9th Cir.1992). In *Streit,* the defendant was charged inter alia with "carrying" a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). *Id.* at 897. During deliberations, the jury asked whether "holding a gun in one's hand [would] be considered carrying?" The trial court responded with this instruction:

> Members of the jury, you are advised that 'carrying' a firearm includes possession of the firearm for purposes related to the commission of a crime of violence. Carry can include transport or possess. "Carrying" should not be construed in a hypertechnical or narrow way.

*Id.* at 899. We approved this instruction, citing *Barber* as our authority.

In *United States v. Hernandez,* 80 F.3d 1253 (9th Cir.1996), however, a case *not* involving a motor vehicle, we failed to acknowledge either *Barber* or *Streit,* and we did not confine our untidy holding either to its facts or to its nonvehicular context. This oversight caused us to veer off course in numerous subsequent cases involving firearms in vehicles (car cases) where we applied inappropriately the "immediately available for use" test described in *Hernandez.* We left *Barber's* transportation test in the dust, with no explanation or reason given, logical or otherwise. *Hernandez* gives us a perfectly good test for carrying when vehicles are *not* involved, but the test fails to give Congressional will its meaning when vehicles are involved. I doubt Congress would recognize Judge Kozinski's distinction as advancing its purpose. Among other glaring defects, it gives drug traffickers the least exposure to the law's reach when they are the most vulnerable to detection by law enforcement.

---

**2.** The Eighth Circuit held in *United States v. Freisinger,* 937 F.2d 383, 387 (8th Cir.1991) that "carrying a firearm in a vehicle is within the ordinary meaning of 'carrying a firearm.' " The Eighth Circuit subsequently held that this definition survives *Bailey. United States v. Willis,* 89 F.3d 1371, 1379 (8th Cir.1996).

To explore § 924(c)(1)'s purpose and to escape the purely semantic trap, I'd like to come at the issue from the perspective of those outlaws whose life-threatening conduct Congress explicitly set out to punish in 18 U.S.C. § 924(c)(1). This, of course, is the perspective of the drug trafficking offender who shields himself from the perils of his trade by arming himself with a firearm. A drug trafficker with a firearm makes a statement that he is willing to kill to succeed in his crimes. I do not conjure this perspective out of thin air: every detail of it emerges from the plain language of the statute, from its pellucid purpose, from the compelling legislative history behind its enactment, and from the behavior of drug traffickers Congress sought to manacle. Here it is:

I am a drug trafficker. You'll find my story in almost every volume of Fed Second and Fed Third. I have plans to deliver the methamphetamine I just cooked to my new customers, so I do what I always do: I take the drugs and my firearm to my car to meet the buyers in some parking lot. I take my weapon, of course, to protect me from a rip off, from disagreements with customers, and from the police.

You circuit judges were correct when you observed that "trafficking in narcotics is very often related to the carrying and use of firearms." *United States v. Willis*, 899 F.2d 873, 875 (9th Cir.1990) (quoting *United States v. Ramos*, 861 F.2d 228, 231 n. 3 (9th Cir.1988)). Mine is an outlaw business. We don't rely on the covenant of good faith and fair dealing to keep our business affairs on an even keel. We can't file a lawsuit or call the police when things go sour. The law is no use to us, so self-help—usually with firepower—is the name of the game. If I have to, I might even shoot it out with the police. The new Sentencing Guidelines and those mandatory minimums are rough. In fact, I don't want to have anything to do with the police, so when I get to my car, I stash the gun I am carrying and my drugs somewhere out of sight. Law books and prisons are full of people whose cases started with a traffic stop. Maybe I will put my gun in the trunk or under a seat, but one thing is sure: it will be hidden until I need it. My guns must remain hidden when I'm in public until I need them. Otherwise, they are a ticket to federal prison. My strength becomes my weakness.

But the police who stop us are wise. They know that a firearm and drugs are linked together like a hand in a glove, so sometimes we go to unusual lengths to hide our guns in our cars when we are most vulnerable to detection. On occasion, we hide them not only in the trunk or under the seat, but even under the hood. Yes, under the hood. We "conceal weapons in the engine compartment of a car for two reasons: 1) so that [we can] have ready access to the gun, but police do not easily discover it; and 2) so that [we can] disclaim knowledge of the weapon if police do discover it." *United States v. Webb*, 115 F.3d 711, 713 (9th Cir.1997). Good luck convincing the jury that a gun under the hood of a rental car or even in the trunk is mine. I may be a criminal, but at least I'm good at it.[3]

So imagine my surprise and delight when I read the majority opinion in this case and learned that although I "carried" my gun to the car "during and in relation to a drug trafficking crime," I was no longer "carrying" the gun as I secretly transported it to the sale because it wasn't "immediately available." Thanks for the distinction. And for the cover. Now we know how to beat 18 U.S.C. § 924(c)(1). Even though it can be proved to the satisfaction of a jury beyond a reasonable doubt that I carried the firearm to stick it in the trunk or under the hood, and that I then transported it during and in relation to my sale of meth, as a matter of law I am beyond the reach of the statute Congress drafted to address this particular

---

**3.** Judge Kozinski makes the wholly pointless statement that a gun in a bag under a tarp on a truck bed poses substantially *"less risk"* than one in a drug trafficker's hand. I respond with two comments. First, "less risk" here is another misleading word game. Anthrax in a bottle poses substantially *"less risk"* than anthrax in a missile warhead. "Less risk" has meaning in the insurance business, but not here. Second, Judge Kozinski sees the world in stop action segments. Risk when? This is the kind of thinking that gives ammunition to police officers who believe we live in an ivory tower.

problem. I thought I was carrying my firearm and that it was immediately available, but I guess you didn't.

Thanks.

I choose this unorthodox method of exposing the untoward consequences of Judge Kozinski's opinion because I respectfully believe his highly scholastic analysis suffers from a preoccupation with subtlety and is divorced from the real street world of drug traffickers Congress sought to address. Only a person trained in an American law school under the Socratic method could postulate the formal but fanciful freeze-frame distinctions that animate the conclusion that a firearm transported in a drug trafficker's car on the way to a sale is not "carried" by him. The courts are supposed to interpret Congressional will, not contrive sterile artificial lines. The statute we interpret here on its face covers "carrying."

We seem to have a short institutional memory. Once before we impressed a narrow reading on this statute, and the Supreme Court told us we were wrong. In *United States v. Phelps,* 877 F.2d 28, 30 (9th Cir. 1989), we held that trading a gun in exchange for narcotics could not constitute "use" of a firearm during and in relation to a drug trafficking offense. The Eleventh Circuit disagreed with us in *United States v. Smith,* 957 F.2d 835 (11th Cir.1992), and to resolve the conflict, the Supreme Court granted certiorari in *Smith v. United States,* 508 U.S. at 223, 113 S.Ct. at 2050. Rejecting our "fine metaphysical distinction," *id.* at 240, 113 S.Ct. at 2060, the Court said:

> There is a significant flaw to this argument [in favor of restricting the meaning of "to use" a firearm to using it as a firearm for its intended purpose]. It is one thing to say that the ordinary meaning of "uses a firearm" *includes* using a firearm as a weapon, since that is the intended purpose of a firearm and the example of "use" that most immediately comes to mind. But it is quite another to conclude that, as a result, the phrase also excludes any other use.

*Id.* at 230, 113 S.Ct. at 2055 (emphasis added).

Justice O'Connor held that another flaw in making such a distinction was that it "does violence not only to the structure and language of the statute, but to its purpose as well." *Id.* at 240, 113 S.Ct. at 2060. "Language," she said, "... cannot be interpreted apart from context." *Id.* at 229, 113 S.Ct. at 2054.[4] She identified the purpose of this statute as arising from Congress's concern with "drugs and guns [as] a dangerous combination"; and she pointed out that in 1989, "56 percent of all murders in New York were drug related," and that the same figure in Washington, D.C. was "as high as 80 percent." *Id.* at 240, 113 S.Ct. at 2060.

*Smith* stands for the proposition that there are different ways within this statute to "use" a gun. One way can be to use it as a weapon, another is to use it as an item of barter. Similarly, I would think that just as there are different ways to use a firearm, there are also different ways to carry it. One way is in your hand, another is to carry it in the trunk of your car.

As for the rule of lenity, Justice O'Connor warned that "the mere possibility of articulating a narrower construction ... does not by itself make the rule of lenity applicable." *Id.* at 239, 113 S.Ct. at 2059. With all respect to the majority, the use of the rule here is unpersuasive and more makeweight than substance. No drug trafficker in the world (including Foster as shown in his pre-trial memo to the district court) would make this distinction, not one.

I'm at a loss to fathom the compulsion to read "carry" as it relates to vehicles in a constricted manner. The capacity to engage in the midnight gray/battleship gray debate is admirable, but this indulgence simply leads us astray. The irony of the majority's opinion is that it recognizes the weakness of its own cramped analysis when it defines carrying as including beyond on-the-body-possession, possession where the firearm is "imme-

---

**4.** The Supreme Court subsequently reminded us that when we construe words in a statute, we must "consider not only the bare meaning of the word but also its placement and *purpose* in the statutory scheme." *Bailey,* 516 U.S. at ——, 116 S.Ct. at 506 (emphasis added). Judge Kozinski's word games prove my point: context and purpose erase ambiguity.

diately available." But, Judge Kozinski stops short of a rational application of this logical step to motor vehicles.

An application of this new test to a usual traffic stop scenario illustrates its fickleness. Suppose an officer asks Foster to step to the rear of his truck while the officer checks his license and runs him for warrants: is Foster now carrying the gun because he is standing right next to it? What if Foster retrieves his license from the zip-up bag containing his firearm, but secretly continues to hide the gun from the officer? Surely under Judge Kozinski's test, he is carrying the firearm as he does so. Is he no longer carrying it if he then moves to the front of the truck or returns to the passenger compartment? All of this makes for fun in the Socratic classroom, but it does not work on the streets of America, which is what Congress had in mind when it drafted this legislation.

Cars, of course, are designed to carry people and things from place to place. Cars function as extensions of the person when it comes to transporting objects. A car is simply a means of transportation—like a holster. The Supreme Court figured this out in Fourth Amendment car search cases. It finally tired of useless differences becoming constitutional distinctions and declared open season on every place and everything in a car that could conceal the object of a search. The Court said, "We conclude [in light of the practical confusion generated by the old rule] that it is better to adopt one clear-cut rule to govern automobile searches and eliminate the warrant requirement ... set forth in [*Arkansas v.*] *Sanders* [, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) ]." *California v. Acevedo*, 500 U.S. 565, 579, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). Given the meaning of "carry" in the vehicular context, this suggests that *anywhere* in the vehicle will do.

Parenthetically, even if I were to agree with Judge Kozinski's holding, I would still conclude that *all* guns transported in vehicles during and in relation to a drug crime are "immediately available," or at least that a properly instructed jury could so find. As the car travels with the trafficker, so does the gun.

Thus, the question in a given vehicle case boils down to a matter of proof. If the government can prove that a drug trafficker is transporting a firearm in a motor vehicle *during and in relation to a drug trafficking crime,* (or that he so carried it when he put it in the vehicle), then "carrying" has been established as has the crime charged. If the proof isn't sufficient, then the requirements of the statute are not satisfied. As then Judge, now Justice Kennedy said, "the 'in relation to' language ... make[s] clear ... that a person [cannot] be prosecuted [pursuant to this statute] for committing an entirely unrelated crime while in possession of a firearm." *United States v. Stewart,* 779 F.2d 538, 539 (9th Cir.1985), *overruled on other grounds, Hernandez,* 80 F.3d at 1253.

The Supreme Court made similar observation in *Smith:*

> We are not persuaded that our construction of the phrase "uses ... a firearm" will produce anomalous applications. See post, at 242 (example of using a gun to scratch one's head). As we already have noted and will explain in greater detail later, § 924(c)(1) requires not only that the defendant "use" the firearm, but also that he use it "during and in relation to" the drug trafficking crime. As a result, the defendant who "uses" a firearm to scratch his head, or for some other innocuous purpose, would avoid punishment for that conduct altogether....

508 U.S. at 232, 113 S.Ct. at 2056 (citations omitted).

### What have other circuits said?

Looking at opinions from other circuits, Judge Kozinski concludes they are "all over the map." Once again, only thinking makes it so. He proclaims disarray where there is none, and then uses it as a rationalization for his holding. The First, Fourth, Fifth, Seventh, Eighth, Tenth, Eleventh, and even the Ninth until today all seem to be in general agreement. Here is a summary of what each have to say.

First Circuit: "[W]e agree with the Fourth, Seventh, and Tenth Circuits that a gun may be 'carried' in a vehicle for the

purposes of § 924(c)(1) without necessarily being immediately accessible to the defendant while it is being transported." *United States v. Cleveland,* 106 F.3d 1056, 1066 (1st Cir.1997), *cert. granted,* — U.S. —, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997).

Fourth Circuit: "And, because the firearm placed in the trunk of the automobile for the journey to the transfer point [of the sale] is obviously being 'carried' under the plain meaning of that term, the firearm does not cease to be 'carried' simply because it is not readily accessible to the offender." *United States v. Mitchell,* 104 F.3d 649, 653–54 (4th Cir.1997).

Fifth Circuit: "When, as here, the defendant knowingly possesses a firearm in a motor vehicle and uses the vehicle during the commission of the underlying crime, then as a matter of law the firearm is carried during a drug-trafficking offence for purposes of § 924(c)." *United States v. Muscarello,* 106 F.3d 636, 639 (5th Cir.1997), *cert. granted,* — U.S. —, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997).

Seventh Circuit: "The question before us is not where the gun was located at the time of arrest, but rather did the defendant *carry* the gun during and in relation to a drug trafficking crime. It does not matter where the gun was at the time of the arrest, . . . . [W]e need not concern ourselves with the question of whether the gun was within immediate reach. Not only was the gun likely carried in relation to the drug trafficking crime at the time that it was placed in the compartment with drugs, but it was also surely carried in relation to the crime when it was transported in a car in the same compartment that contains drugs possessed with the intent to distribute." *United States v. Molina,* 102 F.3d 928, 931–32 (7th Cir.1996).

Eighth Circuit: "As we said in *Freisinger,* [937 F.2d at 387,] 'when a motor vehicle is used, carrying a weapon takes on a less restrictive meaning than carrying on the person. The means of carrying *is* the vehicle.'" *United States v. Nelson,* 109 F.3d 1323, 1326 (8th Cir.1997) (emphasis added). In fact, "our prior decision in *Freisinger,* [holding that the common usage of carries includes carrying in a vehicle survives *Bailey,*] and

remains binding precedent on this court." *Willis,* 89 F.3d at 1379.

Tenth Circuit: "In light of the above, our pre-*Bailey* cases, correctly interpreted, hold that the government is required to prove only that the defendant transported a firearm in a vehicle and that he had actual or constructive possession of the firearm while doing so. . . . We see nothing in *Bailey* that conflicts with our pre-*Bailey* 'vehicular carrying' line of cases." *United States v. Miller,* 84 F.3d 1244, 1259–60 (10th Cir.1996), *overruled on other grounds, United States v. Holland,* 116 F.3d 1353 (10th Cir.1997).

Eleventh Circuit: "The evidence presented by the government is enough to support Farris' conviction on the gun charge. The jury heard that Bush originally told agents the gun belonged to Farris; the gun was present in a car from which drugs were being distributed; Farris set up the drug deal and was to make the sale; and Bush never left the car which contained the remaining cocaine and the gun. From this the jury could find that the Toyota was used as a drug distribution center and that Farris knew the firearm was in the automobile. Put differently, the jury could find that the firearm [in the glove compartment] was being carried by Farris[, who was sitting in the backseat,] in the vehicle." *United States v. Farris,* 77 F.3d 391, 395–96 (11th Cir.1996).

While we have been debating this case en banc, the Supreme Court has granted certiorari in *Cleveland* and *Muscarello.* I am certain that our opinions will contribute to a final resolution of this issue.

### How did the firearm get in the truck?

Yet another serious problem exists with the majority's resolution of this appeal: they restrict the ultimate question in the case to whether Foster was carrying a gun "when he drove with it in his truck bed." The problem with this freeze-frame formulation, as recognized by the Seventh Circuit in *Molina,* is that the loaded gun didn't crawl by itself into the truck bed of Foster's car with the incriminating drug paraphernalia—any more than did the O'Haus scale, the baggies, and the price list. To repeat from *Molina,* "It does

not matter where the gun was at the time of the arrest, ... [W]e need not concern ourselves with the question of whether the gun was within immediate reach.... [T]he gun [was] carried in relation to the drug trafficking crime *at the time that it was placed in the compartment with the drugs*.... The relation between the firearm and the drugs— which is, after all, the core of the offense—is best established by their relation to each other, and not by the distance between owner and the gun at the moment of arrest." *Molina*, 102 F.3d at 931–32 (emphasis added). Given the strong evidence in this case, as arrayed in the panel opinion, *United States v. Foster*, 57 F.3d 727 (9th Cir.1995), why could the jury not have concluded circumstantially that Foster carried the gun when he placed it in the truck?

In fact, Foster did not deny that the gun was his or that he possessed it or even that he carried it. Foster alleged only that the *"during and in relation"* element of the charge was not adequately explained to the jury or proved. In a pre-trial memorandum filed on May 15, 1989, Foster's attorney chose not to contest the carrying element of the charge, and even conceded it with a ploy commonly called confession and avoidance:

> 2. Defendant's Position
>
> It is the Defendant's Leon Foster [sic] position that he is not involved in the manufacture or distribution of amphetamines. In addition it is the Defendant's position that the drugs found at the residence were not his. Since he was not involved in any illegal activity there was no violation of the law *by him carrying around the firearm in his vehicle.* As such, he is not guilty on any charge.

(emphasis added).

One might find it ironic that Foster's lawyer understood his client's involvement with the firearm as "carrying," yet we do not.

Any lingering question about whether Foster was carrying the firearm or whether he put it in the trunk is answered by his testimony on direct examination at the trial:

> A. ... In the back of my trunk I had a little blue zip-up bag that I had a 9 millimeter in that I had over in the mountains, because where we ride there's a lot of rattlesnakes out there. I remember standing behind the pickup while they were searching the vehicle. They asked me if I had any weapons or guns on my person, weapons or knives on my person, and I responded no, that I did not, that *I did have a pistol in the back of the truck.* I informed them of that. (emphasis added).

On cross examination, Foster reaffirmed his knowing possession and transportation of the gun in his truck.

> Q. Now, the gun you had when you were arrested, that's this one here, that 9 mm gun?
>
> A. Yes, sir.

In a footnote I fail to comprehend, Judge Kozinski says, "How do we know that Foster, and not someone else, took the gun to the truck?" One only has to read Foster's testimony and his trial memo to answer this untenable question.

Given the rest of the drug related evidence in the back of the truck and elsewhere, the jury concluded that the gun was related to possession of drugs and conspiracy, both continuing offenses. Foster's attempt to extricate himself from the avalanche of evidence against him by claiming he carried the gun to shoot snakes is hardly credible and did not raise a doubt in the mind of a single juror who heard it. The evidence to support the jury's conclusion is overwhelming, especially when viewed in the light most favorable to it.

### Does Foster's appeal survive plain error review?

Here, however, is a serious twist which Judge Kozinski brushes aside in a footnote: Foster did not object at trial to the definition of "carry" being used to convict him or to *any* aspect of that element of the charge. He failed utterly to challenge its meaning and focused instead as promised in his trial memorandum on whether the government could prove the "during and in relation to" element. Thus, assuming that Judge Kozinski is correct in his new definition of "carry" and that an error has become "plain" on appeal, Foster's failure to object requires us to subject this issue to plain error analysis

pursuant to Fed.R.Crim.P. 52(b). *See Johnson v. United States,* —— U.S. ——, ——, 117 S.Ct. 1544, 1546, 137 L.Ed.2d 718 (1997). In *Johnson,* the Supreme Court held that plain error review as outlined in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) applies on direct appeal to matters to which a defendant did not object at trial. The Court explained its reasoning as follows:

> [I]t is [Rule 52] which by its terms governs direct appeals from judgments of conviction in the federal system, and therefore governs this case. We cautioned against any unwarranted expansion of Rule 52(b) in *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), because it "would skew the Rule's 'careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed,'" *id.* at 15, 105 S.Ct. at 1046. Even less appropriate than an unwarranted expansion of the Rule would be the creation out of wholecloth of an exception to it, an exception which we have no authority to make.

*Johnson,* —— U.S. at ——, 117 S.Ct. at 1548 (citations omitted).

After *Olano* and *Johnson,* I beg to differ with Judge Kozinski's assertion that our review of this case is somehow independent of Rule 52(b).[5] I find no support anywhere for this sweep-the-chess-pieces-off-the-board pronouncement. In fact, *Johnson* itself dictates to the contrary:

> Petitioner argues that she need not fall within the "limited" and "circumscribed" structures of *Olano,* because the error she complains of here is "structural," and so is outside Rule 52(b) altogether. *But the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure.*

*Johnson,* —— U.S. at ——, 117 S.Ct. at 1548 (emphasis added). I find it surprising that we defy *Johnson* less that a year after it was decided. *Johnson* was a bucket of cold water

in our face to remind us of the statutory limits on our authority.

In a nutshell, assuming that Foster was the victim of plain error as to "carry," I would still refuse under *Olano* to exercise our discretion to reverse. Given (1) the overwhelming concrete evidence of guilt, (2) the sensible observation in *Molina* that whoever put the gun in the car surely carried it, in this case Foster, and (3) Foster's unpersuasive defense that although he "carried" the gun in his car—his own lawyer's words—he did not do so "during and in relation to" a drug trafficking crime, Foster's conviction was not a miscarriage of justice. I am convinced beyond all doubt that the "error" does not seriously affect the "fairness, integrity, or public reputation" of this or any other judicial proceeding. *See United States v. Olano,* 62 F.3d 1180, 1188 (9th Cir.1995) (on remand from the Supreme Court); *Johnson,* —— U.S. at ——, 117 S.Ct. at 1546; *United States v. Perez,* 116 F.3d 840, 846 (9th Cir. 1997) (en banc); *United States v. Uchimura,* 125 F.3d 1282, 1286–87 (9th Cir.1997).

At the very least, I would remand this case for a new trial on carrying so that the government can have an opportunity—now that *we* have changed the law—to use the *Molina* theory to try to convict him. Judge Kozinski's reason for refusing to do this is really quite arresting: the government has not asked for this opportunity. Of course! The government relied at trial in 1989 and relies here on appeal on *Barber* and *Streit*—and quite properly so. Foster did not even contest carrying at trial. *We* are the ones improvidently pulling that rug out from under them, and we now rely on *our* alteration of the law and post facto undoing of cases to deny the government the opportunity to adjust its case to our new holding. It is only "too late in the day" because of *our* inability to provide coherent and stable direction to the parties. Such a holding is the apotheosis of imperiousness.

### Postscript.

I conclude with an excerpt from an article written by Judge Robert Gardner, once the

---

**5.** We were simply wrong in our pre-*Johnson* decision in *United States v. Lopez,* 100 F.3d 98, 103

n. 10 (9th Cir.1996) when we applied a harmless rather than a plain error test.

Presiding Justice of California's Fourth District Court Appeal and a well-respected jurist. The article speaks volumes about making much ado about very little. It is the story of a legendary California Justice of the Peace and City Judge of the Laguna Beach Township in the 1950s: The Honorable C.C. "Gavvy Cravath." Gavvy wasn't a lawyer, he was a retired big league baseball player—in fact, the acknowledged first king of the home run before Babe Ruth. As a layperson Justice of the Peace, he had little patience for angels dancing on pins (or swallows, bits, serves and trips), and it showed in the manner in which he instructed a jury as to the plain meaning of words:

> Gavvy had a favorite, if uncomfortable way, of expressing his distaste for the legal profession. After the taking of evidence, the judge instructs the jury as to the law. In those days, we made up our own instructions. Now it is done with a handy little book. However, in those days, you would spend countless hours in the law library preparing instructions which told the jury that your side of the case was right. Your opponent was doing the same thing. Then you both handed your sets of instructions to the judge and hoped he would read yours to the jury. Gavvy would have none of this nonsense. He would look at this awesome stack of papers for a moment, shake his head in disgust, then in full view of the jury throw all of these wonderful works of legal art into the wastebasket. Then Gavvy would turn to the jury and say something like this: *"Ladies and gentlemen of the jury. The defendant is charged with stealing $50 from Mr. Jones, I certainly hope that you have lived long enough to know what stealing means without my spending a couple of hours telling you the fine legal distinctions in the law on theft. Stealing means exactly what it says.* The district attorney has the responsibility of proving that the defendant is guilty of theft beyond a reasonable doubt and to a moral certainty. If he hasn't carried that burden, you are to acquit the defendant. You have heard the evidence and are the only ones who can decide who is telling the truth and who is not. Now retire, deliberate and come to a

decision." As I look over the above, it's not bad. Frankly, it's a lot better that the countless hours of hairsplitting refinements and nitpicking redundancies I inflicted on juries throughout my years as a trial judge under the guise of instructing them as to the applicable law.

Robert Gardner, *Gavvy Cravath—An Orange County Original.*

I respectfully dissent.

